Polly M. MORRISON et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.

1754 N Street Associates Limited Partnership, Intervenor.

No. 79–784.

District of Columbia Court of Appeals.

Argued April 8, 1980.

Decided Sept. 9, 1980.

Rehearing and Rehearing En Banc Denied Nov. 6, 1980.

Nicholas A. Addams, Washington, D.C., for petitioners.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., adopted intervenor's brief.

Norman M. Glasgow, with whom Whayne S. Quin, Iverson O. Mitchell III, and Maureen D. Stewart, Washington, D. C., were on the brief for intervenor.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

NEWMAN, Chief Judge:

This is a petition for review of two orders of the Board of Zoning Adjustment (hereinafter referred to as the Board) granting to the intervenor/applicant (N Street Associates) a variance which permits construction of a 5.5 FAR (floor area ratio) office building in an SP-2 zone, a zone which limits office buildings to a 3.5 FAR.[1] Petitioners seek reversal of these orders contending that: (1) the Board's action was invalid because the chairman revoked his sua sponte recusal and subsequently participated in the decision which resulted in the grant of the variance; and (2) the Board failed to give adequate notice that a request for a variance would be considered at the public hearings.[2]

In Part I of this opinion we set forth the pertinent facts and Board proceedings. In Part II, we consider the chairman's recusal and hold that due to a change in circumstances, which removed the original basis for disqualification, the chairman had authority to revoke his recusal and participate in the decision. In Part III of this decision we review petitioners' notice contention, and hold that the advertisement of the public hearings was sufficient to apprise interested parties of the action to be taken at the meetings. Finding no error, we affirm the decision of the Board.

1. On May 10, 1979, the property was rezoned to SP-1, allowing only a 2.5 FAR.

2. Petitioners also contend that (1) the Board's grant of the variance was tantamount to spot zoning; and (2) the Board abused its discretion in granting the variance. After reviewing these arguments, we find them to be without merit.

I

The present proceedings arise from an application submitted to the Board by intervenor, N Street Associates, seeking a variance in order to erect an office building in the rear of 1752–1756 N Street, N.W. The subject site is currently improved with three townhouse-type structures, located in the Dupont Circle Historical District, a Category II Place listed in the District of Columbia Inventory of Historic Sites. On May 24, 1978, intervenor consented to the imposition by the State Historic Preservation Officer of a 180-day delay in demolition, in order to negotiate for the preservation of the historic structures involved. Four formal negotiation sessions were held with interested parties, including members of the community, representatives of Don't Tear It Down and the Dupont Circle Advisory Neighborhood Commission, representatives of the Joint Committee on Landmarks, and the State Historic Preservation Officer.

Prior to these negotiations, intervenor had filed an application with the Board to operate a parking lot on the subject sites. On April 19, 1978, the case was called for a hearing, and Board Chairman, Leonard McCants, Esq., recused himself from participating in the case because he was a private attorney in unrelated litigation opposing John Antonelli, one of the principal partners in N Street Associates.[3]

On September 6, 1978, intervenor filed application No. 12783 with the Board seeking permission to construct a 5.5 FAR office building in the then SP zone. At the time of the filing of the application, the SP regulations in effect, permitted, with Board approval, the construction of office buildings with a 5.5 FAR. On September 14, 1978, however, the Zoning Commission announced new SP regulations and designated

3. The hearing on this application took place on June 7, 1978, and resulted in the Board's denying the applicant permission to use the property for a parking lot.

the 1700 block of N Street, N.W., as an SP–2 area. As a result of this new classification, the permissible office FAR was reduced from 5.5 to 3.5.

On September 22, 1978, the public hearing with regard to application No. 12783 (intervenor's proposed office building) was advertised. There was no mention of a request for a variance in order to comply with the new FAR regulation, apparently because it had not been included in the original application. On October 25, 1978, at the first of four public hearings on the application, intervenor Antonelli, orally moved for, and the Board granted over objection, permission to amend the application to seek: (a) a FAR variance from the permitted 3.5 to 5.5 FAR, and (b) a waiver of the vesting regulation which would have precluded a 5.5 FAR office building and limited it to a 3.5 FAR. Petitioners requested a continuance on the grounds that the interim change in the area from SP to SP–2 required the application to be read-vertised, noting the need for a variance. The Board denied the request, finding that all opposing parties had sufficient notice and would have a full opportunity to testify and cross–examine the applicant regarding the variance.

On December 6, 1978, the Board voted 3–1 to grant intervenor's application with Chairman McCants abstaining, since he had previously recused himself. On January 30, 1979, the Board's written order was issued and shortly thereafter petitioners filed a motion for reconsideration. Petitioners' motion for reconsideration was granted in part,[4] while the Board also stayed the January 30 order.

At a meeting on May 2, 1979, the Board, by a 2–2 vote, was unable to dispose of a motion to vacate the previous order in the case. The Board deferred consideration of the issue until June 6 and requested the chairman, who had previously recused himself, to read the record and participate in the case. The chairman assented to the Board's request, noting that the matters originally causing his recusal had been resolved. On July 9, 1979, the Board issued a final order reinstating and incorporating its January 30, 1979 order, which granted intervenor's application.[5]

II

■ There is no controlling statute or board regulation governing the disqualification of board members. In order to insulate the administrative process and its decision makers from prejudice and bias, it has generally been recognized that the same rules requiring the recusal of judicial officers are applicable to administrative officers who act in an adjudicative or quasi–judicial capacity. 4 B. Mezines, J. Stein, & J. Gruff, Administrative Law § 36.02 [1] at 36–7 (1977) ("hearing examiners and agency members performing quasi–judicial functions are held to the same standards regarding bias, prejudice, and . interest as are courtroom judges"); see Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (the fundamental requirements of due process apply to administrative agencies which adjudicate as well as to courts); NLRB v. Phelps, 136 F.2d 562, 563 (5th Cir. 1943) (rigidity of requirement of impartiality should apply "more strictly to an administrative adjudication where many of the safeguards which have been thrown around court proceedings have . . . been relaxed"); 2 K. Davis, Administrative Law Treatise § 12.02, at 152 (1958); 1 Am. Jur.2d Administrative Law § 63 at 859–60 (2d ed. 1962). In the absence of a statute providing otherwise, a judge must recuse himself when his alleged bias arises from a

---

4. At the reconsideration hearing no new evidence was presented. Instead, the hearing was restricted to consideration of the following four issues: (1) the Board's authority to grant a FAR variance; (2) the absence of a variance regarding an apartment house window; (3) the uniqueness of the shape of the lot in comparison with other property in the neighborhood;

and (4) the harmony of the proposed building with the already existing architecture in the neighborhood.

5. Had the chairman not participated in the decision and the vote remained at 2–2, intervenor would have been denied the application.

source outside the "four corners of the court–room," *Tynan v. United States*, 126 U.S.App.D.C. 206, 210, 376 F.2d 761, 765, *cert. denied*, 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967) (quoting *In re Federal Facilities Realty Trust Co.*, 140 F.Supp. 522 (N.D.Ill. 1956)), and results "in an opinion on the merits on some basis other than what a judge learned from his participation in the case." *In re Evans*, D.C.App., 411 A.2d 984, 995 (1980), quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). In this case, however, we are not called upon and thus do not address the propriety or necessity of Chairman McCants' initial recusal. Instead, we accept his disqualification, and consider whether or not he may revoke his recusal and participate in deciding the case once the reason for his disqualification has been removed.

Petitioners contend that once a judge disqualifies himself in a case, regardless of a change in circumstances, he is thereafter without authority to act further in any judicial capacity. in the case. In *Kells v. Davidson*, 102 Fla. 684, 136 So. 450 (1931), the leading case in support of petitioners position, the Supreme Court of Florida refused to allow a judge to revoke his recusal despite the fact that the reason for the disqualification had been entirely removed. In adopting this per se rule, the court suggested that a contrary approach might encourage a judge to "falsely pretend and wrongfully cause the record to show that he had divested himself of such interest so that he could retain jurisdiction and try his own case." 102 Fla. 687–88, 136 So. at 451.

We, however, do not find this justification persuasive. In *Dotson v. Burchett*, 301 Ky. 28, 190 S.W.2d 697 (1945), the Kentucky Court of Appeals explicitly rejected the approach followed in *Kells* and held that a judge does not relinquish all jurisdiction in a case upon disqualification. Instead, recognizing that a change in circumstances may be grounds for a judge revoking his recusal, the court stated:

It is readily conceived that a judge may have stepped aside upon misinformation or an an erroneous assumption of fact (such for example, as kinship to one of the parties) and later the error is discovered; *or that he may have been impelled to vacate upon some condition which passes away.* In such a state of case, the judge may consider it his duty to resume the bench. Being competent in the first instance to pass on his qualification, why is he not competent in the later instance under changed conditions? [301 Ky. 31, 190 S.W.2d at 699 (emphasis added).]

Furthermore, to protect against the type of collusion feared by the *Kells* court as well as to ensure the appearance of impartiality, the *Dotson* court held that "the record must clearly reveal the facts upon which revocation [of recusal] is made." *Id.* at 33, 190 S.W.2d at 700.

■ Not only do we find that the more flexible approach of the *Dotson* court provides sufficient safeguards to protect against impropriety, or the appearance thereof, but recognize that it represents the majority position among courts which have considered the issue. *See Kirkland v. Kirkland*, 146 Ga. 347, 91 S.E. 119 (1916) (no opinion reported, but abstract states that judge's revocation of disqualification was effective to preserve jurisdiction, even after case had been referred to another judge); *State ex rel. Mosshammer v. Allen Superior Court*, 246 Ind. 366, 206 N.E.2d 139 (1965) (judge who disqualified himself in a child custody case may rescind recusal if valid grounds appear on the record, such as error or mistake); *Flannery v. Flannery*, 203 Kan. 239, 452 P.2d 846 (1969) (judge can reassume jurisdiction where original cause for disqualification has been removed or has ceased to exist); *Miller–Vidor Lumber Co. v. Schreiber*, 298 S.W. 154 (Tex.Civ.App. 1927) (judge whose brother was a defendant was qualified to hear case despite disqualification, after brother was formally dismissed without objection or exception); *Bank of Marlinton v. Pocahontas Development Co.*, 88 W.Va. 414, 106 S.E. 881 (1921) (judge

who was named as defendant in a certain creditor's suit, but then dismissed as a party, could reassume position as judge even after recusal and appointment of special judge). Thus, we hold that where an administrative officer acting in an adjudicative or quasi–judicial capacity recuses himself from the case, he may revoke his recusal if the initial reason for his disqualification has been removed, and there appears sufficient evidence on the record establishing this change in circumstances.

■ Applying this standard to the facts of this case, it is apparent that the chairman retained the authority to revoke his recusal and reenter the case once the reason for his disqualification no longer existed. Prior to any hearings, the chairman, sua sponte disqualified himself because he represented a client who opposed J. O. Antonelli, a party affiliated with the appli-

cant/intervenor, in private litigation unrelated to the present matter.[6] Subsequently, in response to a request by Board members to participate in the case, the chairman indicated that "the matters which had caused him to recuse himself ... had been resolved" and that he therefore could consider the matter.

■ Petitioners, at no time prior to this appeal, objected to the chairman's revocation of his recusal.[7] Even if petitioners had objected, however, the record does not suggest that the chairman's *prior* involvement as an attorney in litigation against John Antonelli somehow prejudiced him. *In re Evans, supra* at 995 ("bias must be personal rather than judicial before recusal will be required"). This is not a case in which the chairman had an *actual* interest in the outcome of the litigation, nor one in which either party alleged *actual* bias. Regard-

---

6. Chairman McCants specified his reasons for disqualification on the record stating:

> Mr. Antonelli, the Chair and members of the Board had discussion with your attorney and the attorney for the opposition concerning the–whether or not I should excuse myself from participation in this case. The Chair still has some problems with it although you have indicated very kindly that I should continue in the case.
>
> By that, you indicated that you thought I would be unbiased in my deciding this case irrespective of any litigation that I may be involved–in which I represent a client against you or companies or organizations that you might be affiliated with.
>
> But the Chair on second thought believes that it may be better if the Chair excuses itself from this case. I do that with an abundance of caution. Sometimes we–in making such decisions you have to weigh a lot of things and I suspect what I am most concerned about is for you, the applicant, to believe that you got the best shot possible. I do not want any second guessing after the case is over that somehow maybe it would have gone a different way had I not been involved in this particular thing–that is what I think.
>
> Secondly and more importantly, if I rule in your favor, there may be some accusation on the other side. Although I have only one vote there are many things that the Chair does in terms of ruling and presiding which– there might be some indications of favoritism one way or the other.

> So, I have decided to excuse myself from this case.

7. Petitioners' failure to object to the chairman's alleged bias prior to this petition for review may constitute a waiver of the issue. *See Turner v. Davis, Wick, Rosengarten Co.,* D.C. Mun.App., 131 A.2d 303 (1957) (where judge informed counsel and parties of his acquaintance with a prospective witness for the plaintiff and defendant refused judge's invitation to have matter transferred to another judge, defendant was not entitled to reversal on theory that judge should have disqualified himself); *North American Airlines, Inc. v. Civil Aeronautics Board,* 100 U.S.App.D.C. 5, 240 F.2d 867 (1956), *cert. denied,* 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957) (" 'respondents are not entitled to sit back until Board decision is imminent and at their convenience come forward with a claim for disqualification of a Board Member based upon alleged facts within respondents' knowledge long prior to consideration of th[e] case' " (quoting the Board's previous decision)); *De Foe v. Potomac Electric Power Co.,* D.C.Mun.App., 123 A.2d 920 (1956) (where judge informed complaining party's counsel of possible grounds for his disqualification and counsel maintained that the judge could continue to sit, the failure to disqualify the judge could not be raised on appeal), 2 K. Davis, Administrative Law Treatise *supra,* § 12.05 at 168 ("[F]ailure to object to alleged bias until after an adverse decision has been made may be held to amount to a waiver and may bar the reviewing court from considering the question.") (footnote omitted).

less of the original necessity for recusal, there was no basis for disqualification once the chairman's association with a party litigating against the applicant in an unrelated matter was terminated.[8] Thus, it was proper for the chairman to revoke his recusal and participate in the decision.

## III

■ Petitioners also contend that notice with regard to the October 25, 1979 hearing before the BZA was defective and violated Due Process in that it failed to indicate that the applicants would be seeking a FAR variance and waiver so as to comply with the new zoning regulations.[9] Relying on *Castle v. McLaughlin*, 106 U.S.App.D.C. 145, 270 F.2d 448 (1959), petitioners argue that the rezoning constituted such a "fundamental change" in circumstances, that the original notice, without mention of the waiver or variance, was insufficient to warn the public of the proposed action. Petitioners' reliance on *Castle*, however, is misplaced since the facts of this case do not come within the "fundamental change" doctrine.

In *Castle, supra,* notice was given of a proposed zoning change which would have resulted in a slight upgrading of the area. Appellants appeared at the public hearing and expressed support for the proposed plan. There was no discussion of zoning changes other than what was mentioned in the original notice. After the hearing, however, the Zoning Commission instead of upgrading the area as anticipated, promulgated a classification which downgraded the property. After analyzing these facts, the Circuit Court held that "[t]he proposal was so fundamentally changed that a public hearing was required before an amendment embodying the change could validly be adopted." *Castle, supra* at 149, 270 F.2d at 452.

Applying the above standard to the present case, it is apparent that the scope of the applicant's proposed action was not so fundamentally changed so as to render the notice insufficient. The original application seeking permission to construct the office building was filed with the Board on September 6, 1978. At that time the SP regulations then in effect permitted, with Board approval, construction of office buildings with a 5.5 FAR. Thus, the erection of the proposed structure was initially allowable without the grant of a variance.

On September 14, 1978, *after* the filing of the application, the Zoning Commission announced new regulations changing the 1700 block of N Street from an SP to an SP-2 zone and thereby reducing the permissible office FAR from 5.5 to 3.5. Since these new regulations were a matter of public record, petitioners, as well as the public generally, were on notice that construction of the proposed building was now impermissible without the Board's first granting a variance. Not only were petitioners intimately familiar with the proposed building plans, which had remained unchanged despite the new zoning regulations, but had in fact participated in negotiations during the development stages. Thus, it should have been apparent that the notice which read "in the SP District" instead of "the SP-2 District" had merely been advertised in accordance with the old regulations which had been in effect at the time the application was originally filed. In light of these facts, and petitioners' familiarity with the proposal, we hold that they cannot complain that they were inadequately informed. *See Russell v. District of Columbia Board of Zoning Adjustment,* D.C.App., 402 A.2d 1231 (1979) (notice that erroneously described scheduled

8. In the future, we do not preclude parties from alleging and proving reasons for disqualification continuing beyond the date of such association. On this record, however, no such reason has been suggested.

9. On September 6, 1978, when the intervenors originally filed their application seeking permission to construct the office building, the area was designated an SP zone, thus permitting buildings with a 5.5 FAR. On September 14, however, the Zoning Commission announced new regulations changing the 1700 block of N Street, N.W. to an SP-2 zone and thereby limiting the permissible FAR to 3.5.

action as a lot width variance instead of a lot area variance gave reasonable notice).

*Affirmed.*