Gloria GLADDEN, et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.

No. 93–AA–1609.

District of Columbia Court of Appeals.

Argued April 4, 1995.

Decided June 5, 1995.

---

John M. Coles for petitioners.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Erias A. Hyman, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for respondent.

Before FERREN and STEADMAN, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

A District of Columbia property owner submitted an application to the District of Columbia Board of Zoning Adjustment ("BZA") for a special exception from the zoning laws in order to establish in his house a youth rehabilitation home. Petitioners, residents of the 5C subsection of Ward 5 of

the city who live in close proximity to the proposed youth rehabilitation home, opposed the application on the grounds that the home would have an adverse affect on the neighborhood. The BZA, after a hearing, approved the exception with several special conditions.

Petitioners seek review of the Board's order in this court, alleging that (1) the BZA decision was not supported by the evidence of record; (2) they were given no opportunity to review a so-called security plan proposed for the operation of the home; and (3) the BZA was not impartial in rendering its decision to grant the special exception. Pursuant to the concession in the respondent's brief, we remand the case to BZA so that it may obtain the security plan, permit petitioners to comment upon it and then review it in light of such comment and determine whether the exception for the home was properly granted. Otherwise, we reject petitioners' contentions and affirm all other aspects of the BZA's decision.

## I.

The record reflects the following. The co-owner of a house and real property located at No. 2 T Street, N.E. filed an application before the BZA for a special exception under 11 DCMR § 335.1 to establish a youth rehabilitation home for ten youths, ages 13–19.[1] The BZA held a hearing on June 9, 1993. There was evidence that the three-story building for which the exception is sought contains nine bedrooms and four bathrooms. This property was to be leased to Dytrad Management Services, a corporation which is licensed already to operate four youth homes in the District under the trade name Gateway Youth Home Educational Designs, Inc. ("Gateway"). The purpose of the home is to provide counseling and discipline in a non-institutional setting in order to rehabilitate the residents for reintegration into society.

The proposed home would have eight full-time and four part-time employees, would

1. "Youth rehabilitation homes ... for one (1) to fifteen (15) persons, not including resident supervisors or staff and their families, shall be permitted in an R–4 district if approved by the Board of Zoning Adjustment in accordance with the conditions specified in § 3108 of chapter 31 of this title, subject to the provisions of this section." 11 DCMR § 335.1.

include counselors and mental health specialists, and would not be open to drug users. The residents would go to school during the day and would be allowed to return to their families on the weekends. The rehabilitation home was to be Gateway's third operating project. Witnesses testified that Gateway has one of the best rehabilitation programs in the city.

The District of Columbia Office of Planning recommended approval of the project with several conditions. The Office informed the Board that no other community-based residential facilities were within a 500–foot radius of the project, but noted that two were located in the vicinity. The Office of Planning concluded that the project would not adversely affect the community and would have no significant impact in terms of traffic and noise.

A day after the Office of Planning made its recommendation to the BZA, the Department of Public Works reported that the project would minimally affect traffic. Neither the Office of Planning nor the BZA ever received a written report from the Metropolitan Police Department despite referral and some follow-up.[2] Among the conditions recommended to the BZA by the Office of Planning was preparation of a "security plan."

A Gateway witness at the BZA hearing responded to the Office of Planning concerns by describing some aspects of a security plan, but a security plan, *in toto*, was never submitted to the BZA. The Neighborhood Advisory Commission ("ANC") and several neighbors testified against granting the exception. The ANC noted that the area is already "saturated" with group homes, including five in the surrounding five-block area and twenty-one altogether in Ward 5C. The ANC also noted that the neighborhood near the proposed facility was a high drug area. Many residents of the area testified that another facility was just too many for

the area and that the proposed home would be located in a high crime area. The ANC also was concerned with inadequate parking facilities for the proposed home.

Following the hearing, the BZA reopened the record to obtain a site plan and to receive comments from the office of the Zoning Administrator which informed the Board that only one on-site parking space was required under the zoning regulations. The ANC submitted written "Proposed Findings of Fact and Conclusions of Law" which identified several areas in which the proposed home would have an adverse impact on the community, including (1) lack of adequate parking; (2) that the Ward 5C neighborhood already has in excess of 21 community based rehabilitation facilities, including a homeless shelter, and five in the five blocks around the proposed facility; (3) the neighborhood already has a crime problem, including drugs and prostitution, so it is not a suitable location for ten delinquent youths; and (4) other Gateway facilities in operation have had a high rate of abscondence of youths.

On November 18, 1993, the BZA issued a written decision granting a special exception for this property to be used as a youth rehabilitation home for two years. The Board concluded that there would be no adverse affect on the neighborhood. The BZA further concluded that it could proceed to grant the exception without waiting any longer for a written police report. With respect to parking, the BZA concluded that Gateway would provide one normal-sized space and one compact-car space. The BZA further concluded that "while there may be a number of other facilities located in Ward 5, the Board is bound by the Zoning regulations which allow facilities to be approved if they are not within 500 feet of each other or within the same square."

The Board imposed certain conditions that included requiring the applicant to obtain

2. The District of Columbia Office of Planning memorandum of June 2, 1993, states that the application was referred to six agencies of the District of Columbia government including the police department. The memorandum further states that "[w]ith the exception of OCBRF [The Office of Community–Based Residential Facilities], the Office of Planning had not received

correspondence from any of the aforementioned District government agencies prior to completion of this report." In addition, Ms. Bailey of the Office of Planning testified at the hearing that the written correspondence to the police department was followed by "phone calls" and no written response was ever received.

and maintain three off-site parking spaces and the establishment and maintenance by the applicant of a security program. On a motion for reconsideration, the BZA rejected the contention that it could not proceed without a police report, noting that it is permitted to act without a report within forty days of a request under 11 DCMR § 3318.6.[3]

## II.

Petitioners make three principal arguments on appeal: (1) the record does not support the BZA's conclusion that the facility will not adversely affect the neighborhood; (2) the security plan was not submitted for comment by the public and the ANC before the BZA issued its decision; and (3) the BZA was not impartial.

■■■ First, we address the sufficiency of the BZA's findings based upon the evidence of record. We note that a BZA decision will be upheld "if there is a rational basis for it" and if the facts found by the Board have "substantial support in the evidence." *Citizens Coalition v. District of Columbia Bd. of Zoning Adjustment*, 619 A.2d 940, 947 (D.C. 1993). "This court is not to substitute its judgment for that of the agency, and thus the decision of the BZA will be upheld provided there is a rational basis for it." *Id.* at 947. Our review is summarized as follows:

A decision by the BZA will not be set aside if: (1) the decision was accompanied by findings of fact sufficient to enable a reviewing court to reach a decision; (2) the decision reached by the agency follows as a matter of law from the facts; and (3) the facts so stated have substantial support in the evidence.

Accordingly, our scope of review is "limited to whether the Board's interpretation is legally consistent with the regulations and whether the decision is clearly arbitrary and capricious in both a factual and a legal context." *Salsbery v. District of Columbia Bd. of Zoning Adjustment*, 318

A.2d 894, 896 (D.C.1974) (citations omitted).

*Id.* at 947 (citations omitted).

■■■ The BZA must also address and make specific findings on each issue raised by the ANC, D.C.Code § 1–261(d) (1992), but the agency "is not required to defer to the ANC's views" but must only "address ANC concerns with particularity." *Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 746 (D.C.1990). Petitioners challenge five aspects of the BZA's conclusions as either not supported by the evidence or not adequately addressed or explained in the BZA's findings and conclusions. These five issues are (1) adequacy of parking; (2) the rate of abscondence from the Gateway facilities; (3) the impact of the proposed home on the neighborhood; (4) BZA proceeding without a police department report; and (5) the absence of a security plan.

### a.

■■■ Finding No. 3 of the BZA's decision requires *one* off-street parking space for the facility. Petitioner asserts that 11 DCMR § 2101.1 requires *two* parking spaces. However, BZA's conclusion was based on a memorandum from the Zoning Administrator's office stating that only one space is required for the proposed facility. Therefore, we must conclude that the Board's finding is based on sufficient evidence. Nonetheless, petitioners argue that this particular memorandum is in conflict with the zoning requirements. Petitioners' argument fails to take into account the "grandfathering" procedure established by 11 DCMR §§ 2100.1 and 2100.4. "[T]he regulations exempt buildings built before May 12, 1958—the effective date of the parking regulations—from [specific parking] requirement[s]." *Woodley Park Comm. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 490 A.2d 628, 639 (D.C. 1985); *see also Page Associates v. District of Columbia Bd. of Zoning Adjustment*, 463 A.2d 649, 651 (D.C.1983) (noting that buildings built before the regulations that are converted to another use must provide addi-

---

**3.** At least five months had elapsed between the time of the Office of Planning's request for such a report and the date the BZA issued its decision.

tional parking spaces in the amount not grandfathered).

The applicant, upon conversion of his house to a group home, received credit for the "grandfathered" space but was required to provide the second space for a youth rehabilitation home in accordance with the regulation. In sum, we conclude that of the *two* spaces required for a youth rehabilitation home under 11 DCMR § 2101.1 *one* space is supplied by the grandfathered credit for the pre-1958 structure and the applicant provided the *other* space with a standard nine by nineteen-foot space on the premises. We note that the BZA *also* required by a condition contained in its order that the applicant provide an *extra* compact car space. In addition, the BZA required three off-site parking spaces, all to alleviate potential traffic concerns. Under these circumstances we are satisfied that the BZA's decision with regard to the parking spaces provided was a correct interpretation of the applicable regulation and supported by the evidence.

### b.

■ Petitioners challenge the BZA's findings of fact Nos. 8 and 9 which state that the Gateway program will "prevent the youths from adversely impacting the surrounding neighborhood" and will "operate to prevent the impact that crime and other adverse neighborhood conditions will have on the residents of the facility." Specifically, petitioners question these findings in light of Gateway's 38% abscondence rate at its other facilities. However, Board member Bennett pointed out that "the testimony reflected the fact that when youth run, they try to get as far away from the facility as possible.... So while their abscondence probably is detrimental to the District of Columbia as a whole, it is not necessarily detrimental to that neighborhood. At least, the record does not reflect that." There was testimony that those youths who abscond "just take off" and, if caught, go back to court. No contrary evidence was presented and Gateway submitted numerous letters of support from people who live or work near their other facilities. In our review of the record, particularly Board Member Bennett's observation, we are

persuaded that findings of fact Nos. 8 and 9 are sufficiently supported by the evidence.

### c.

■ Petitioners also assert error in the BZA's finding of fact No. 12 which stated that the "proposed use, combined with similar facilities in the area will not adversely affect the neighborhood." The BZA concluded that "while there may be a number of other facilities located in Ward 5, the Board is bound by the Zoning Regulations which allow facilities to be approved if they are not within 500 feet of each other or within the same square." Petitioners assert that by reaching this conclusion the BZA not only ignored the evidence in the record, but failed to meet its statutory and regulatory obligation of giving great weight to the written report of the ANC. *See* 11 DCMR § 3307.2; D.C.Code § 1–261 (1981).

As Chairman Clarens correctly observed there is "no evidence [in the record] that this particular facility would have an actual adverse impact on the community." Clearly, the record reflects that the ANC and members of the community were very concerned that Ward 5C presently contains a disproportionate number of community-based residential facilities. There was evidence presented to the BZA that this subsection of the city already had twenty-one community-based residential facilities, seven other residential facilities primarily for homeless people and six facilities providing social services to homeless persons and drug abusers. Petitioners assert that the BZA simply ignored their concerns that the city was "dumping" all these facilities in one Ward subsection. Petitioners in support of this argument point to *Hubbard v. District of Columbia Board of Zoning Adjustment,* 366 A.2d 427 (D.C.1976). There, this court, in *dicta,* commented that no one section of a community should have to bear a disproportionate share of the burden which community-based residential facilities and social service centers impose on local neighborhoods.

Specifically, we stated in *Hubbard* that
The impact on a neighborhood of such an apparent saturation seems inherently incompatible with the general standards

mandated for halfway houses by § 3104.47(a) of the Zoning Regulations of the District of Columbia (1958), which provides: "Such use is so located that it will not become unduly objectionable to the neighboring properties because of noise or other conditions." No one section of a community should have to bear a disproportionate share of the environmental burden which halfway houses and social service centers necessarily impose on neighboring property.

*Id.* at 429.

Nevertheless, we are constrained to note that since our 1976 decision in *Hubbard,* new zoning regulations have been promulgated. These new regulations regarding rehabilitation and substance abusers' homes state that "[t]here shall be no other property containing a community-based residential facility for seven (7) or more persons within a radius of five hundred feet (500 ft.) from any portion of the subject property," 11 DCMR § 335.3, and the "facility shall not have an adverse impact on the neighborhood because of traffic, noise, operations, or the number of similar facilities in the area." 11 DCMR § 335.6.

We have stated that " '[s]pecial exceptions, unlike variances, are expressly provided for in the Zoning Regulations. The Board's discretion to grant special exceptions is limited to a determination whether the exception sought meets the requirements of the regulation.' " *First Baptist Church v. District of Columbia Bd. of Zoning Adjustment,* 432 A.2d 695, 701 (D.C.1981) (quoting *Stewart v. District of Columbia Bd. of Zoning Adjustment,* 305 A.2d 516, 518 (D.C.1973)). The BZA has no authority to amend any regulation or map. *Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 644 A.2d 434, 436 (D.C. 1994). Thus, we must agree with the BZA's conclusion that as long as the proposed facility did not have another facility within 500 feet and there was no adverse impact on the neighborhood the Board was bound to approve the exception requested by the applicant. In our view the regulations require the Board only to determine whether the "number of similar facilities in the area," in and of itself, has "an adverse impact on the neighborhood" rather than determine whether a section of the city bears "a disproportionate share" of such facilities. Petitioner's concerns regarding the "dumping" of community-based residential facilities in their ward is a concern for the Zoning Commission with its power to amend BZA regulations and the comprehensive plan rather than the BZA with its limited powers.

**d.**

■ Petitioner also asserts error because the BZA acted without any input at all from the Metropolitan Police Department. The Board in its final decision concluded that "considering the evidence of record, it is capable of deciding the application without a report from the Police Department." The BZA had requested a police report, but none was ever submitted so far as the record shows. Petitioner asserts that this particular conclusion by the Board was without adequate justification. In *First Baptist Church, supra,* 432 A.2d at 700, this court remanded to the BZA its decision in part because the Board, without a report from the Department of Transportation, would have difficulty in reaching "an informed and balanced decision." However, we note that 11 DCMR § 3318.6 expressly permits the Board to proceed without a governmental report after waiting forty days. This regulation was adopted by the BZA in August 1982, 29 D.C.Reg. 3719–3720 (1982), and did not exist when this court decided *First Baptist Church.*

The Board in the instant case waited at least five months for a police report and none was received. Although ideally it may have been better for the BZA to proceed only with full reports, we cannot say that the BZA erred under the circumstances here in proceeding to make a decision without waiting any longer for the police report.

**III.**

■ We turn now to petitioners' claim that the BZA's *condition* in its decision that a security program be established and main-

tained was in error.[4] Petitioners assert that they never had an opportunity to review the security program *before* the Board's decision. The District of Columbia concedes in its brief that the petitioners and other interested parties should have an opportunity to comment on the adequacy of a security plan if the Board meant for such a plan to be submitted.[5] Given the Board's requirement that some security plan be established and maintained, we remand the case to be developed and decided by the BZA. Obviously, petitioners must be afforded an opportunity to examine and comment on the security plan which was so important to the BZA but not submitted to the Board before it rendered its decision.

■ Petitioners also claim that the BZA's acceptance of the security plan and off-site parking plan without affording them opportunity to comment constituted a denial of due process and renders invalid the Board's entire decision. Our remand will allow petitioners to examine and then comment to the Board on the security plan, thus meeting petitioners' stated concern. As to the parking plan, the Board's decision was *not* based upon new evidence or a parking plan submitted subsequent to the hearing. Adequacy of parking is a requirement in obtaining a grant of the exception for the home. The additional condition the BZA imposed was not necessary for its approval of the exception application and was not included in the application. The additional off-site parking requirement was a condition required by the Board in response to neighborhood traffic and parking concerns raised during the hearing and comment process. Since petitioners were afforded the opportunity to comment on traffic and parking issues, the condition imposed by the Board did not deny them due process.

## IV.

■ Finally, petitioners allege that the BZA lacked the requisite impartiality required to make its decision in this case. Particularly, petitioners assert that the *Jerry M.*[6] consent decree requiring, among others, the District of Columbia to develop juvenile rehabilitation facilities and programs within the city improperly influenced the Board in the instant case to grant approval of the exception for this facility. Petitioners point to several pieces of evidence presented at the hearing that allegedly reveal the BZA's partiality in granting the exception sought, including (1) a memorandum dated April 28, 1993 from the Office of the Corporation Counsel to the Office of Zoning concerning the *Jerry M.* consent decree and identifying applications pending before the BZA including the one in this case; (2) the June 2, 1993 report of the Office of Planning in this matter stating that "this project would assist to satisfy Order B, Objective 15, of the *Jerry M.* Consent Decree;" (3) public testimony by an employee of the Youth Services Administration involving the *Jerry M.* consent decree; and (4) statements by the BZA members.

■ BZA members are quasi-judicial administrative officials who operate under the same recusal standards as judges. *Morrison v. District of Columbia Bd. of Zoning Adjustment*, 422 A.2d 347, 349–50 (D.C.1980); *Jarrott v. Scrivener*, 225 F.Supp. 827, 835 (D.D.C.1964); *cf. Vann v. District of Columbia Bd. of Funeral Directors*, 441 A.2d 246, 249–50 (D.C.1982). Recusal is necessary when the alleged bias is traceable to a source *other than* the judge's participation in the case. *Morrison, supra,* 422 A.2d at 350. Thus, *ex parte* contacts with BZA members can result in the absence of an impartial

4. Petitioner also asserts that the BZA's finding of fact No. 13 which states that "the applicant previously provided care for a number of youths without adversely impacting the community" was "irrelevant, immaterial and purely gratuitous." This finding of fact was based on the testimony of the wife of the applicant and therefore was based on substantial evidence.

5. The District asserted *during oral argument* that a remand was not necessary because the peti-

tioners did not adequately preserve this issue for appeal and failure to do so constituted a waiver by them of the issue. However, because the District *first* presented this new contention during oral argument and this argument itself raises issues of possible waiver and failure to preserve it for appeal we conclude the District is bound by its brief.

6. *See District of Columbia v. Jerry M.,* 571 A.2d 178 (D.C.1990), and 580 A.2d 1270 (D.C.1990).

hearing. *Jarrott, supra.* Petitioners do not assert specific *ex parte* contacts or non-public influences that were brought to bear in this case. Here, all the *alleged* improper influence on the BZA members was part of the record, either in the form of submitted letters or actual testimony and statements. Thus, petitioners had the opportunity to focus on and develop these points at the hearing and did not do so. We are not persuaded that the Board acted without the requisite impartiality.

We remand the case for further development of and decision by the Board on the security plan for the home. We affirm the BZA's decision in all other respects.

*So ordered.*