**THE GEORGE WASHINGTON UNIVERSITY, Plaintiff,**

v.

**THE DISTRICT OF COLUMBIA, et al., Defendants.**

**No. CIV. 01–0895(LFO).**

United States District Court, District of Columbia.

June 15, 2001.

James Thomas Lenhart, Washington, DC, for Plaintiff.

Andrew J. Saindon, Office of Corrections Counsel, D.C., Washington, DC, for Defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, the George Washington University, is before the Court seeking a preliminary injunction, which would preclude the enforcement of "Condition 9," a portion of the District of Columbia Board of Zoning Adjustment's March 29, 2001 Order approving the University's "campus plan." Condition 9 imposes a limit or cap on the number of full-time undergraduate students which the University may enroll at the number of students enrolled as of February 13, 2001, until the University is able to house 70% of its full-time undergraduates on campus. It also prohibits the University from seeking "special exceptions", or development permits, for non-residential development projects until the 70% goal is met. The University challenges this condition on numerous constitutional grounds in its papers and at an extensive hearing on June 12, 2001. The plaintiff made the requisite showing to support its motion for a preliminary injunction and the defendants have not effectively traversed it. Accordingly, an accompanying order grants that motion, subject to certain conditions.

## I.

George Washington University was established by federal charter in 1821 thereby realizing a vision of George Washington himself. It has been located in D.C.'s Foggy Bottom neighborhood since 1912. The District's zoning laws require universities to operate pursuant to "campus plans" approved by the District of Columbia Board of Zoning Adjustment ("BZA" or "Board"). A campus plan generally outlines the proposed uses for the campus; a university must apply for a "special exception" in order to receive approval for any specific development project.

The University began putting together its proposed campus plan in late 1998 in anticipation of the expiration of the then-current plan in December 2000. It filed its new plan with the Board in December 1999. The proposal with respect to student housing drew expressions of concern from the neighborhood. During a meeting on February 13, 2001, the Board indicated that it would approve the University's plan, subject to a number of conditions, including a cap on future growth of the plaintiff's student body, at its level on that date. Its March 29, 2001 final order approving the plan stated:

> The Board concludes that the Applicant has met its burden of showing that the university uses will not be objectionable to neighboring property.... The Board concludes that both factors—the insufficient supply of on-campus housing and expansion of university use through off-campus acquisition—are likely to exacerbate objectionable impacts on neighboring property unless steps are taken to prevent that outcome.... As a condition of approval of the 2001 campus plan, the University must limit enrollment of full-time undergraduate students to that number enrolled as of February 13, 2001 ("benchmark enrollment") until the University has available on-campus housing in an amount that will house 70 percent of its undergraduate population.

Board Order, March 29, 2001, at 10–11 (Pl.'s Mem. Ex. A). The Order excludes from its definition of full-time students: part-time or evening students, married students or those with children, students with disabilities or religious beliefs inconsistent with dormitory life, and students who commute from outside D.C. Order at 14. Because the University has not historically maintained such statistics about its students, it contends that its allowed enrollment was frozen by the Board in the midst of the admissions process at a num-

ber that neither the University nor the Board knew, knows or can know, without additional data, difficult to obtain until registration of students in August 2001. The University filed the instant action on April 25, 2001. On April 30, 2001, it also filed a Notice of Appeal from the Zoning Board's Order invoking the D.C. Administrative Procedure Act with the D.C. Court of Appeals.

The University, as is typical of most institutions of higher learning, requires many months of lead time for the selection of students for each academic year. For the freshman class to enter in August of 2001 the University received applications for the early decision process until November 1, 2000, and extended offers based on those applications on December 15, 2000. Decl. of Kathryn Napper ¶ 5. It received applications for its second round of early admissions until January 15, 2001, and extended additional offers on February 3, 2001. On March 23, 2001, the University sent out offers to regular applicants, not seeking early admission, with responses due by May 1, 2001. Napper Decl. ¶¶ 6, 8.

Thus, the University began, and was well along with, processing the class to enter in August 2001 when the Board established the February 13, 2001 cap. That process reflected an earlier University decision to accept 100 more freshmen entering in 2001 than in the previous year and to further adjust upward to compensate for the consequences of a possible slowdown in the economy. However, University officials did not know as of February 13 how many freshmen would actually accept and matriculate or how many upperclassmen would actually return for the forthcoming year. The University now (June 2001) estimates that "we will have at least 400 more freshmen in our freshmen class than last year." Transcript of June 12, 2001, Preliminary Injunction Hearing at 4;

see also Supp. Decl. of Kathryn Napper ¶¶ 2, 4. If Condition 9 obtains, the University is likely to have to "disinvite" previously accepted students or violate Condition 9.

## II.

■ To obtain a preliminary injunction, an applicant must establish: (1) a substantial likelihood of success on the merits; (2) irreparable injury in the absence of an injunction; (3) less injury to the non-moving party than the moving party if an injunction is ordered; and (4) that a preliminary injunction is consistent with the public interest. *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir. 1998).

Although the plaintiff claims that it is likely to establish that Condition 9 of the Order violates multiple constitutional provisions, it need only show a substantial likelihood of success on one of its claims to satisfy that requirement for relief. The plaintiff has adequately demonstrated a substantial likelihood that aspects of Condition 9 are so arbitrary and capricious as to violate the plaintiff's right to substantive due process. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (noting the right to be free from arbitrary and irrational government decisions). To show a substantive due process violation in this context, a plaintiff must show that the actions of the Board are unsupportable on any rational basis. *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1221 (6th Cir.1992); *see Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C.Cir.1988).

The simple and decisive facts are that: Condition 9 sets an enrollment cap based on a number of students that is unknown and presently unascertainable. In defining full-time students, the Order excludes

married students, those with children, those with religious beliefs that prevent them from living on campus, and those who commute from outside of the District of Columbia. The plaintiff does not maintain, and has demonstrated that it cannot obtain, *past* statistics that track those student characteristics, as of February 13, 2001, and thus does not know the number of students enrolled on February 13, 2001 who are to be considered full-time students for the special purposes of the enrollment cap. Furthermore, the cap was imposed after the admissions process for the class entering in August 2001 was in midstream. Thus, Condition 9 imposed conditions that could not be met and afforded the plaintiff no reasonable opportunity to come into compliance before the cap (whatever it was) went into effect. Condition 9 partakes of the essence of "arbitrary and capricious."

Finally, the Board conceded in Condition 9 that the University's proposed use was not then objectionable, but that objectionable impacts were *likely* if a cap were not imposed. The Board's findings suggest that its action was an attempt to alleviate future problems, not imminent ones. The imposition of a cap as of February 13, in light of the implication that there was no immediate crisis to justify such drastic action, is irrational, especially when considered in light of the fact that it is quite feasible for the University to gather the data necessary to reach a rational decision in August 2001, when students register for the upcoming academic year.

Significantly, the Board's Order also prevents the plaintiff from applying for approval of any *non-residential* development projects on campus until the 70% housing requirement is met. Defendants conceded at the hearing that the restriction on applications is only a means of enforcing the cap. But the restriction lacks any demonstrated connection to that goal. Plaintiff has indicated that it currently has approved plans for residential projects on campus that will be completed in 2 to 4 years. It is unreasonable to assume that limiting the plaintiff's ability to develop its own property for previously approved non-residential uses will cause the residential projects to be completed sooner.

The foregoing facts make it likely that plaintiff will prevail on its due process claim. In the time-sensitive circumstances present at this preliminary stage of the matter, it is unnecessary to address plaintiff's other constitutional claims. They may be addressed in connection with the permanent injunction.

 In the absence of an injunction, the plaintiff faces severe and irreparable injury. It is in the untenable position of either beginning its academic year with enrollment in violation of the Board's Order, or withdrawing offers of admission to students previously admitted for the Fall of 2001. The potential damage to the plaintiff's reputation as an academic institution if, a few weeks before registration, it rejected several hundred previously admitted students is real and immediate, not to mention the impact on such rejected students, to whom the University has an obvious responsibility, particularly those who would have, for example, declined offers from other universities in reliance on the University's offers of admission.

 The defendants counter with the suggestion that the Order is not directly enforceable and that the plaintiff would not be significantly damaged by simply violating it. Such a suggestion is, of course, untenable for a great university, particularly one originally conceived of by, and named for, George Washington. The defendants, on the other hand, can point to no injury, irreparable or otherwise, that

they will suffer if the enforcement of Condition 9 is simply delayed to afford the parties an opportunity to devise a rational limit and to provide enough lead time to put it into effect consistent with the University's commitments to previously admitted students. This is particularly true in light of the Board's finding of *likely* objectionable impacts, as discussed above, rather than immediate ones.

The defendants argue that the University's injury is self-inflicted because it made offers of admission to its regular applicants on March 23, 2001, after it knew about the February 13, 2001 enrollment freeze. In the fall of 2000, the University's Board of Trustees set an enrollment goal of 150 more incoming freshmen for the fall of 2001 than had been enrolled in the fall of 2000. Napper Decl. ¶ 2. According to representations made by plaintiff's counsel at the June 12, 2001 hearing, the income expected from these additional students was calculated into the University's budget. The University commenced accepting students for the 2000–2001 academic year as early as December 15, 2000. Although it extended additional offers after the Board announced a cap but before its final Order was issued, it was unreasonable to require the University to derail a lengthy and complex admissions process that was well underway.

■ The public interest weighs in favor of issuing a preliminary injunction. The plaintiff is a federally chartered educational institution that contributes significantly to the District of Columbia, both financially and in reputation. The public has an interest in its reputation for integrity and fair dealing, and for its continued success as a premier university. Although the public also has an interest in the preservation of its neighborhoods in accordance with the goals of the D.C. Comprehensive Plan, a delay in enforcement of an enroll-

ment cap does not materially implicate those interests.

\* \* \* \* \* \*

There is also a related public interest, reflected in the concept of federalism, that a local zoning matter has a place in the local system of justice. See, e.g. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Apparently recognizing this, plaintiffs have filed in the District of Columbia Court of Appeals a parallel petition to review Condition 9. The accompanying Order implements that action by making it a condition for the relief granted that the plaintiff also seek the equitable relief sought here in the District of Columbia Court of Appeals. If that court should grant that relief, its orders will be treated with all the deference that the doctrine of "abstention" will allow. *Cf. New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989).

\* \* \* \* \* \*

An accompanying Order implements the decisions announced herein.

## ORDER

For reasons stated in the accompanying Memorandum, it is this 15th day of June, 2001, hereby

ORDERED: that plaintiff's motion for a preliminary injunction is GRANTED and that the defendants shall comply with the following terms of the injunction, subject to the conditions hereafter stated:

1. Defendants District of Columbia and Board of Zoning Adjustment ("Board") and all those acting in concert with them shall not enforce Condition 9 of the Board's March 29, 2001 Order with respect to the University's undergraduate enrollment for the academic year 2001–2002, or until further order of this Court.

2. Defendants are shall not enforce Condition 9's restriction on the University's privilege of filing any applications for special exceptions as defined by Condition 9 with the expectation that the defendant Board will process the applications as rapidly as it would if there were no Condition 9.

It is hereby further

NOTED: that the granting and enforcement of this injunction is conditioned upon the following:

1. The University will determine as precisely as possible the number of "full-time undergraduates" (as that term is defined in Condition 9), enrolled at the commencement of the academic year 2001–2002 and shall report its determination (including identification by category of the number of students excluded from the category of "full-time undergraduates" in accordance with the definition in Condition 9) to the Court and the defendants on or before *September 30, 2001.*

2. The University shall use its best efforts to include in its claims that are the subject of its pending Petition for Review in the District of Columbia Court of Appeals a request for equitable relief of the same nature that it seeks in this Court, the defendants having undertaken to join with the University in a motion before the Court of Appeals for expedited consideration of that Petition.

It is hereby further

ORDERED: that, in light of the Court's findings of minimal injury that will be caused to the defendants by its compliance with this injunction, the plaintiff shall give security as required by Federal Rule of Civil Procedure 65(c) in the amount of $1,000.00; and it is further

ORDERED: that the University may file, on or before *July 13, 2001,* an opposition to any motion the defendants may file in response to plaintiff's complaint; and it is further

ORDERED: that defendants may, *on or before July 25, 2001,* file a reply to plaintiff's opposition.