Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――

No. 02-7055                         September Term, 2002
& No. 02-7060

Filed On:  February 11, 2003

GEORGE WASHINGTON UNIVERSITY,
A FEDERALLY CHARTERED UNIVERSITY,
APPELLEE/CROSS–APPELLANT

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION, ET AL.,
APPELLANTS/CROSS–APPELLEES

Before:  Ginsburg, *Chief Judge*, Henderson, *Circuit Judge*
and Williams, *Senior Circuit Judge*.

## O R D E R

It is ORDERED by the Court that the opinion of February
4, 2003 in the above entitled case be amended as follows:

Page 4, line 21, insert "on campus or" between "one" and
"non-Foggy Bottom".

Page 10, line 24, insert "off-campus" between "students"
and "in".

Page 10, line 28, insert "off-campus" between "current" and
"student".

Page 10, line 31, insert "off-campus" between "its" and
"Foggy".

Page 11, line 2, insert "off-campus" between "its" and
"Foggy".

Page 11, line 5, replace "its Foggy Bottom" with "those".

Page 11, line 13, insert "on-campus or" between "housing" and "outside".

Page 11, line 17, insert "off-campus" between "living" and "in".

Page 11, lines 18–19, replace "the university dorms" with "university properties".

Page 11, line 20, insert "off-campus" between "the" and "Foggy".

Page 13, line 29, replace "clause of the Fourteenth Amendment" with "element of Fifth Amendment due process".

**FOR THE COURT:**

Mark J. Langer, Clerk

BY:

Deputy Clerk

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 24, 2002      Decided February 4, 2003

No. 02-7055
& No. 02-7060

GEORGE WASHINGTON UNIVERSITY,
A FEDERALLY CHARTERED UNIVERSITY,
APPELLEE/CROSS–APPELLANT

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION, ET AL.,
APPELLANTS/CROSS–APPELLEES

————

Appeals from the United States District Court
for the District of Columbia
(No. 01cv00895)

————

*Lutz Alexander Prager*, argued he cause for appellants/cross-appellees. With him on the briefs were *Charles L. Reischel*, Deputy Corporation Counsel, and *Donna M. Murasky*, Assistant Corporation Counsel.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Deborah B. Baum* argued the cause for appellee/cross-appellant. With her on the briefs were *David J. Cynamon* and *J. Thomas Lenhart*.

Before: GINSBURG, *Chief Judge*, HENDERSON, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

WILLIAMS, *Senior Circuit Judge*: This case is the most recent stage of a long-running land-use dispute between George Washington University ("GW" or "the university") and the District of Columbia's Board of Zoning Adjustment (the "Board" or the "BZA"). GW's campus is bounded on the west and north by the District's Foggy Bottom and West End neighborhoods (here referred to collectively as "Foggy Bottom"), and the BZA has been concerned about protecting their residential character and "stability." In an order approving the university's long-term campus improvement plan (the "BZA Order" or the "Order") the BZA imposed conditions aimed at limiting, and even rolling back, encroachment into Foggy Bottom by the university—or, more precisely, its students. The district court upheld some of the conditions, but also found some to be unconstitutional denials of substantive due process. Both sides appealed; we find no constitutional violation.

\* \* \*

The District's zoning scheme for universities, promulgated by the Zoning Commission pursuant to the authority granted by D.C. Code § 6–641 and codified at 11 District of Columbia Municipal Regulations ("DCMR") §§ 210, 302.2 & 507, permits university use as a matter of right in areas zoned for high-density commercial use. For land zoned residential or "special purpose," it permits university use as a special exception. GW's land evidently includes high-density commercial, special purpose, and residential portions. In the areas where university use is by special exception, the owner

must secure permission for specific university projects in a two-stage application process. In the first stage, the university submits a "campus plan" that describes its general intentions for new land use over a substantial period (GW's preceding plan was for 15 years). On approval by the Board—an approval that can be subject to a set of conditions designed to minimize the impact of the proposed development—the campus plan "establish[es] distinct limitations within which all future construction must occur." *Levy v. D.C. Bd. of Zoning Adjustment*, 570 A.2d 739, 748 (D.C. 1990). In the second stage, the BZA reviews individual projects that the university proposes to undertake, evaluating them both for consistency with the campus plan and the zoning regulations. See *Draude v. D.C. Bd. of Zoning Adjustment*, 527 A.2d 1242, 1247–48 (D.C. 1987).

In both stages, the BZA has substantial, but not unbounded, discretion to reject or approve the university's application. It is instructed to make sure that any university use is located so that it is "not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions." 11 DCMR § 210.2. When reviewing a special exception application for a university, the BZA is also to consider the policies of the so-called "District Elements of the [Comprehensive] Plan," *id.* § 210.7, a planning document setting out development policies for the District, 10 DCMR § 112.6(b). If the application meets these criteria—that is to say, the proposed use is consistent with the Comprehensive Plan and is not likely to become objectionable to users of neighboring property—the Board "ordinarily must grant [the] application." *Stewart v. D.C. Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973).

In late 1999 the university submitted a campus plan for the years 2000–10, reflecting its intentions to expand. Although BZA's concern over the university's effects on Foggy Bottom had been expressed in review of its 1985 plan, the sharp expansion of its enrollment in the 1990s made the issue more acute. Relying in part on submissions of the District's Office of Planning, the BZA found that the university's past acquisition of buildings in Foggy Bottom (and their subsequent

conversion into dormitories or student apartments), as well as undergraduates' informal off-campus housing, threatened the "livability and residential character" of the Foggy Bottom neighborhood. As a result, it conditioned its approval of the 2000 Campus Plan on a series of measures designed to limit the presence of undergraduates; these measures included provisions requiring the university to house its freshmen and sophomores on campus and to provide on-campus housing for at least 70% of its students, and imposing an enrollment cap tied to the university's supply of on-campus housing.

The university challenged the BZA action in federal district court in 2001, and won a preliminary injunction against enforcement of parts of the BZA order. *George Washington University v. District of Columbia*, 148 F. Supp. 2d 15 (D.D.C. 2001). But the court conditioned enforcement of the injunction on GW's pursuit of the same relief before the District of Columbia Court of Appeals, *id.* at 19, which in turn remanded the order to the BZA for revision. The BZA then eliminated the enrollment cap but required the university to provide housing on campus or outside of Foggy Bottom for 70% of its approximately 8000 undergraduates, plus one on campus non-Foggy Bottom bed for every fulltime undergraduate student over 8000. The new Order issued on January 23, 2002, and GW promptly renewed its court challenge. The district court found that several conditions of the BZA Order, including the new housing requirements, violated the university's right to substantive due process, but rejected its claims that the zoning regulations were facially unconstitutional and that the District's actions infringed on its First Amendment rights. *George Washington University v. District of Columbia*, Civil Action No. 01–0895 (D.D.C. Apr. 12, 2002). Both sides appealed. We reverse in part, finding no constitutional infirmities.

\* \* \*

The university's primary challenges sound in substantive due process. Although that doctrine normally imposes only very slight burdens on the government to justify its actions, it

imposes none at all in the absence of a liberty or property interest. See, e.g., *Bd. of Regents v. Roth*, 408 U.S. 564, 569–70 (1972).

In the land-use context courts have taken (at least) two different approaches for determining the existence of a property interest for substantive due process purposes. In *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 601 (3d. Cir. 1995), the Third Circuit held that an ownership interest in the land qualifies. Other circuits, including the Second, Fourth, Eighth, Tenth and Eleventh Circuits, have focused on the structure of the land-use regulatory process, pursuing a "new property" inquiry, cf. Charles Reich, "The New Property," 73 YALE L. J. 733 (1964), and looking to the degree of discretion to be exercised by state officials in granting or withholding the relevant permission. See *RRI Realty Corp. v. Village of Southampton*, 870 F.2d 911, 917 (2d Cir. 1989); *Gardner v. Baltimore*, 969 F.2d 63, 68 (4th Cir. 1992); *Bituminous Materials v. Rice County*, 126 F.3d 1068, 1070 (8th Cir. 1997); *Jacobs, Visconsi & Jacobs Co. v. City of Lawrence*, 927 F.2d 1111 (10th Cir. 1991); *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989). GW urges us to adopt the Third Circuit's approach but also contends that it has a "new property." Because we agree on the latter point, we need not decide whether the Third Circuit's approach is sound or exactly how it would apply.

The majority approach may seem at odds with ordinary language, in which we would say, for example, that a particular piece of land in Washington is "the property" of GW. But an all-encompassing land use regulatory system may have either replaced that "property" with a "new property" (or with several, one for each authorized class of use), or conceivably have replaced it with less than a new property (thereby, one would suppose, effecting a taking).

Within the majority there is considerable variety in the courts' formulae for how severely official discretion must be constrained to establish a new property. The Second Circuit apparently will not find one if the authority has any discretion to deny approval of the proposed land use. See *Natale v.*

*Town of Ridgefield*, 170 F.3d 258, 263 (2nd Cir. 1999). The Eighth Circuit, in contrast, inquires whether the "statute or regulation places substantial limits on the government's exercise of its licensing discretion," *Bituminous Materials v. Rice County*, 126 F.3d 1068, 1070 (8th Cir. 1997); see also *Littlefield v. Afton*, 785 F.2d 596, 602 (8th Cir. 1986) (asking whether "the City's decision making power is significantly and substantially restricted"), finding a property interest if the agency is so constrained. In our view, the Eighth Circuit's analysis is more in line with analogous Supreme Court precedent and the precedent of this circuit. See, e.g., *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (finding discretion to be constrained by "substantive predicates", such as an instruction that prison visitation may be denied when "the visitor's presence . . . would constitute a clear and probable danger"); *Olim v. Wakinekona*, 461 U.S. 238, 249 (inquiring as to whether there exist "substantive limitations on official discretion"); *Washington Legal Clinic v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) (applying *Olim*).

In practice, the fact patterns of new property cases in the land use arena seem to divide into two sets, one set involving virtually unlimited discretion, the other rather absolute entitlement. In *Bituminous Materials*, for instance, the regulation in question specified that the agency "may" grant the permit, without setting out any substantive standards to follow. 126 F.3d at 1070. Similar substance-less directives form the basis for the regulations at issue in *Gardner v. Baltimore*, 969 F.2d at 70 (noting that the regulations were "silent as to the substantive criteria used by the Commission to evaluate the sufficiency of those plans"); *Jacobs*, 927 F.2d at 1111 (noting that the board's discretion was limited only by a general "reasonableness" requirement, not a substantive standard); and *Spence v. Zimmerman*, 873 F.2d at 258 (finding no property interest in a certificate that "*may* be issued for a portion of or portions of a building which may be safely occupied" but with no mandate for issuance even then). On the other side, for example, *Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995), handily found a property interest when the highway superintendent was to issue a

permit for street excavation to a public utility so long as its application stated "the nature, location, extent and purpose" of the excavation, and gave adequate undertakings that it would restore the street to its original condition. See also *Scott v. Greenville County*, 716 F.2d 1409, 1418 (4th Cir. 1983) (finding a property interest when permit must issue upon "presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance").

The university's expectations for a "special exception" fall between these poles, but we think closer to establishing, as *Bituminous Materials* said, "substantial limits on the government's exercise of its licensing discretion." Here, for a residential or special purpose parcel, university use "shall be permitted as a special exception" if the criteria for the exception are met. 11 DCMR § 210.1. Moreover, the District of Columbia courts have interpreted this provision to mean what it says—namely, that special exceptions must be issued as a matter of right if the qualifying criteria are met. "The Board's discretion . . . is limited to a determination whether the exception sought meets the requirements of the regulation. . . . [If so,] the Board ordinarily must grant [the] application." *Stewart v. D.C. Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973); see also *Gladden v. D.C. Bd. of Zoning Adjustment*, 659 A.2d 249, 255 (D.C. 1995).

Of course, some of these qualifying criteria are by no means self-defining. In particular, 11 DCMR § 210.2 says that university use shall be located so that it is "not likely to become objectionable to neighboring property." But combining this provision with 11 DCMR § 210.1 (see above), it seems inescapable that the BZA can deny the university a special exception only by an explicit finding that the proposed use is likely to become "objectionable"—a term that we think clearly places "substantive limitations on official discretion." Although 11 DCMR § 210.2 speaks of uses "objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions," plainly the final wrap-up clause does not invite the BZA members to apply their own personal tastes; they must rest the "objection[s]"

either on the criteria specified in § 210.2 or otherwise made relevant by the Code, regulations, the Comprehensive Plan or other pertinent legal provisions.

In addition, the BZA's conduct and procedures indicate that it interprets the regulations as imposing substantive limits on its discretion. For instance, its Order of March 29, 2001 started with a series of detailed "findings of fact" establishing for the record the objective conditions created by the university's property use. See Joint Appendix ("J.A.")[1] 191–99. It states that it is "authorized to grant a special exception where, in the judgment of the Board *based on a showing of substantial evidence*, the special exception . . . will not tend to affect adversely the use of neighboring property." *Id.* at 199 (emphasis added). Although of course a local law mandate of minimum procedures cannot generate an entitlement, *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983); *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 541 (1985), the District's provision of fairly formal procedures supports our reading of the regulations as imposing "substantial limits on the [Board's] exercise of its licensing discretion." *Bituminous Materials*, 126 F.3d at 1070.

Once a property interest is found, however, the doctrine of substantive due process constrains only egregious government misconduct. We have described the doctrine as preventing only "grave unfairness," *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988), and identified two ways in which such unfairness might be shown: "Only [1] a substantial infringement of state law prompted by personal or group animus, or [2] a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983." *Id.* See also *Tri County Industries v. District of Columbia*, 104 F.3d 455, 459–60 (D.C. Cir 1997); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 465–67 (7th Cir. 1988) (noting the "uncanalized discretion" inherent in substantive due process review and thus, given

---

[1] We note with dismay that the Joint Appendix, though only 400 pages long, is broken into five separate volumes, evidently to attain maximum achievable inconvenience.

the otherwise resulting federal judicial intrusions on state and legislative authority, the need to limit its role to extreme cases).

In attacking the conditions, the university makes a stab at the "group animus" angle suggested in *Silverman*, saying that the BZA Order reflects the hostility of the Foggy Bottom residents to students. As Foggy Bottom is a residential area, and apartments occupied by students are indisputably a residential use, it seems inescapable that the District is drawing a distinction based on student status. But just what sort of "group animus" the *Silverman* court had in mind is unclear. An equal protection violation would of course be independently unlawful, and the university does not make a serious analytical case for the proposition that students should be viewed as a "suspect class" for equal protection purposes. On the other hand, creation of a sort of shadow equal protection doctrine in the name of "substantive due process" seems just the sort of error against which we and others have cautioned. See *Tri County Industries*, 104 F.3d at 459 (cautioning against the use of substantive due process to address constitutional challenges directly governed by an explicit constitutional provision).

In any event, even assuming the legitimacy of any such shadow doctrine, the university offers us neither a "Brandeis brief" nor any other basis for even doubting the implicit basis for the Board's distinction of students from others—namely, that on average they pose a risk of behavior different from that generally preferred by non-student residents and legally relevant. Instead GW invokes District law to show the impropriety of such a distinction, pointing to provisions such as D.C. Code § 2–1402.21, which bars discrimination "based on . . . matriculation" for certain types of real estate transactions, and *id.* § 2–1401.01, saying that it "is the intent of the Council of the District of Columbia . . . to secure an end in the District of Columbia to discrimination . . . by reason of . . . matriculation." It also notes the District of Columbia Court of Appeals' observation that "a university—even a law school—is not to be presumed, for the purposes of the Zoning Regulations, to be the land use equivalent of the bubonic

plague." *Glenbrook Rd. Ass'n v. D.C. Bd. of Zoning Adjustment*, 605 A.2d 22, 32 (D.C. 1992). But even if GW reads District law correctly, a breach of local law does not of itself violate substantive due process. *Tri County Industries*, 104 F.3d at 459. Accordingly, we think the university falls short in its effort to show a deprivation of substantive due process by reference to "group animus."

Perhaps implicitly pointing to a "deliberate flouting of the law that trammels significant . . . property rights," GW also complains of what the District now calls the "transitional housing plan," Conditions 9(a)-(c) of the Order, which the district court found unconstitutional. These require the university to provide its undergraduates, no later than August 31, 2002, with a total of approximately 5600 beds (corresponding to 70% of the approximately 8000 undergraduates) located either on campus or off campus but outside the Foggy Bottom area. After August 31, 2006, the 5600 beds must be located entirely on campus. The parties agree that this requirement will force the university to acquire temporary accommodations for about 1400 students in off-campus, non-Foggy Bottom locations—accommodations that might be not only expensive (though the university has offered no data on just how large an expense) but less desirable for students than the university housing already available to students off-campus in Foggy Bottom.

GW spins these conditions as generating a completely irrational expense. It says that they in effect render "duplicative" the university's current off-campus student housing in Foggy Bottom, which is (concededly) in full conformity to the residential zoning there. But in reality nothing in the transitional housing plan forces the university to give up its off-campus Foggy Bottom dorms or prevents it from continuing to house students there. If it chooses, it can continue supplying that housing *in addition* to the 5600 beds required by Conditions 9(a)-(c). If it chose that option, it would be providing housing to approximately 85% of its undergraduate students, a percentage that is hardly extraordinary for modern urban American universities; Harvard University, for instance, houses 98% of its undergraduates on campus, and Columbia Univer-

sity about 90%.[2] Of course, the university might choose instead to sell its off-campus Foggy Bottom properties or convert them to another use. But the fact that it might do so doesn't render the District's regulation an improper encroachment on its by-right use of those properties.

Nor is there any irrationality in the District's policy. Given the District's concern that an excess of students in the Foggy Bottom area is negatively affecting the character of the neighborhood, it cannot be irrational for the District to adopt rules likely to limit or reduce the number of students in the area. That seems to be the effect of the BZA Order: it guarantees that, of the approximately 8000 undergraduates, at least 5600 (70%) of them will be provided housing on-campus outside of Foggy Bottom; and since about 1250 students are commuters, married, disabled or for some other reason are not considered by GW to be "well suited for dormitory life", this leaves only about 1150 traditional undergraduates living off-campus in Foggy Bottom, whether their residence was in university properties or in private apartments. Obviously the university's alternative proposal—to count the off-campus Foggy Bottom properties towards the 70% requirement—would not as effectively limit the student presence in Foggy Bottom.

The district court also found a violation in certain provisions that the District characterizes as enforcement and severability mechanisms. Condition 9(e) prohibits the issuance of any new "permit to construct or occupy buildings for nonresidential use on campus" whenever "a semiannual report reveals that [GW] is not in compliance" with the conditions of the Order. The university claims that this condition is purely punitive, as it lacks any relationship to the District's goal of protecting the neighborhood. After all, it says, pro-

---

[2] See, e.g.,

http://www.college.harvard.edu/student/residential_life (noting that all but 200 of the approximately 17,000 Harvard undergraduates live in university-provided housing); http://www.studentaffairs.columbia.edu/admissions/aboutcolumbia/campus/ (noting that 90% of Columbia undergraduates live in university residence halls).

hibiting the construction of non-residential buildings will not cause the new dormitories currently under construction to be completed more rapidly. But Condition 9(e) clearly serves two functions that advance the District's goals. First, it strengthens the university's incentive to comply with the housing provisions. Second, even though the new non-housing construction that Condition 9(e) holds hostage may not relate directly to new housing demands (e.g., new labs replacing old ones do not necessarily meet needs generated by *increased* students), the condition as a general matter keeps housing and non-housing growth proceeding in parallel.

The district court also found a constitutional flaw in Condition 10, which requires freshmen and sophomores to live on campus "to the extent such housing is available." But as the District notes, it was the university that originally proposed this measure as an element of its campus plan. Normally, a party cannot attack its own proposed agency action, see, e.g., *St. Anthony Hosp. v. United States Dep't of HHS*, 309 F.3d 680, 696 (10th Cir. 2002), *Johnson v. INS*, 971 F.2d 340, 344 (9th Cir. 1992), although presumably that concept would not apply where the proposal was closely tied to some other proposed action that the agency rejected. Here, there is no evidence of such close ties to any other specific condition not granted to the university. And, even apart from the university's self-contradiction, the condition seems readily to meet the latitudinarian standards of substantive due process. A city might reasonably consider the youngest college students to be the ones most likely to disturb residents in the surrounding communities, as well as most likely to need whatever shreds of parietal rules may subsist on campus.

Finally, the district court rejected Condition 9(f), which provides that the other provisions of Condition 9 are "integral, non-severable aspect[s] of the Board's approval of this application. If any [provision] ... is declared void for any reason ... no application for a special exception will be processed and no permit to construct or occupy buildings ... may be issued." The university characterizes this provision as an unconstitutional incursion into the province of the judiciary, because it punishes the university for exercising its

legal right to challenge invalid provisions. Under our conclusion here that no other provisions of the Order are void, however, we see no need to address a condition that would take effect only on the opposite contingency.

On its cross-appeal the university claims that the BZA Order infringed its First Amendment rights to academic freedom. It did this, in the university's view, by constraining its determinations of where to build dormitories, how much campus space to devote to dormitories and how many students to admit. In support it points to Justice Frankfurter's concurrence in *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), saying that a university has the right to "determine for itself on academic grounds who may teach, what may be taught, how it shall be taught and who may be admitted to study." *Id*. at 263. But the university cites no case giving universities any special status vis-à-vis neutral, generally applicable zoning and land-use regulations of the standard externality-constraining type. Thus our case is wholly different from, for example, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 611 (1967), which found unconstitutional vagueness in a statute requiring removal of state university faculty members for "treasonous or seditious" utterances or acts, noting the university's place in the "marketplace of ideas." By contrast, the BZA Order merely requires the university to house its students in a way that is compatible with the preservation of surrounding neighborhoods.

The university also argues that the District's zoning regulations are facially unconstitutional under the equal protection element of Fifth Amendment due process because their requirement of two stages of approval imposes burdens on university landowners not imposed on similarly situated non-university actors. But GW acknowledges that universities do not constitute a protected class and so the legislation need only "classify the persons it affects in a manner rationally related to legitimate governmental objectives." *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981). As universities are larger, make more intensive use of their land, and have greater spillover effects on neighboring communities than most other landown-

ers, however, the District's legislative classifications meet this criterion.

Accordingly, the decision of the district court is reversed in so far as it found constitutional violations in the BZA Order and is otherwise affirmed.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring:

Although I concur in the judgment in this case, I believe the majority erroneously recognizes a constitutionally protected property interest where there is none. In doing so, the majority chooses not to embrace firmly, as I would, the substantial authority that employs the claim to entitlement approach, *see, e.g.*, *Bituminous Materials v. Rice County*, 126 F.3d 1068, 1070 (8th Cir. 1997); *Gardner v. Baltimore*, 969 F.2d 63, 68 (4th Cir. 1992); *RRI Realty Corp. v. Village of Southampton*, 870 F.2d 911, 917 (2d Cir. 1989); Maj. Op. at 5, as the proper analytical method to determine if a constitutionally protected property interest exists in the land-use context.

The majority instead simply recognizes that two (at least) approaches exist to answer the question, concluding that under either GW has the requisite property interest. Maj. Op. at 5. But under the "majority" approach of the Second, Fourth, Eighth, Tenth and Eleventh Circuits, a landowner has a protected property interest in a favorable land-use decision only if a "statute or regulation places substantial limits on the government's exercise of its [land-use] discretion," *Bituminous Materials*, 126 F.3d at 1070.[1] Those courts follow the U.S. Supreme Court's guidance found in *Bd. of Regents v. Roth*, 408 U.S. 564, 569–70, 576–77 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."). At the same time, their approach uses a standard that properly "balances the need for local autonomy in a matter of paramount local concern with recognition of constitutional protection at the very outer margins of municipal behavior." *Gardner*, 969 F.2d at 69.

Using this approach, I would not recognize a constitutionally protected property interest in GW's expectation of a "spe-

---

[1] As the majority points out, the circuits vary in deciding how "severely official discretion must be constrained" in order to establish a property interest. Maj. Op. at 5. Even using the Eighth Circuit's approach, the one favored by the majority, *id.*, I would not conclude that GW has a constitutionally protected property interest.

cial exception." Indeed, I find it impossible to conclude the zoning regulations under which the BZA "ordinarily must," *Stewart v. D.C. Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973), approve a special exception for a campus plan only if it determines that the proposed plan is "not likely to become *objectionable* to neighboring property" substantially limit the exercise of its discretion. D.C. Mun. Regs. tit. 11, § 210.2 (emphasis added); *see* D.C. Mun. Regs. tit. 11, § 210.1.

The majority finds sufficient constraint on the BZA's authority in the regulation's command that university use "'shall be permitted as a special exception' if the criteria for the exception are met." Maj. Op. at 7 (quoting D.C. Mun. Regs. tit. 11, § 210.1). But the crucial criterion upon which the BZA's decision depends is whether the proposed use is "objectionable," Maj. Op. at 7—a criterion that requires the BZA to use its judgment in considering numerous factors. D.C. Mun. Regs. tit. 11, § 210.2 ("Use as a college or university shall be located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions."). Heeding advice to hesitate before intervening in local land disputes,[2] I find only a minimal limitation on the Board's discretion that is far from a case where "the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured," *RRI Realty*, 870 F.2d at 918; *Gardner*, 969 F.2d at 68. In fact, the zoning authority has been given "wide discretion" in making its decisions; hence, no constitutionally protected property interest in the special exception exists. *Jacobs, Visconsi & Jacobs Co. v. City of Lawrence*, 927 F.2d 1111, 1116 & n.3 (10th Cir. 1991) (where zoning authority's decision must be "reasonable" and reasonable decision under state law should consider factors such as

---

[2] *Gardner*, 969 F.2d at 67–68 ("[F]ederal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes."). *See also Village of Belle Terre v. Boraas*, 416 U.S. 1, 13 (1974) (Marshal, J., dissenting); *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 605 (3d Cir. 1995) (McKelvie, J., dissenting); *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992).

"zoning and uses of properties nearby," "suitability of the subject property for the uses to which it has been restricted" and "extent to which removal of the restrictions will detrimentally affect nearby property," authority had sufficient discretion to checkmate property interest). It is because GW does not possess a constitutionally protected property interest that I would reverse the district court to the extent it found otherwise.

For the foregoing reasons, I concur in the judgment reversing the district court and I otherwise fully concur in the majority opinion.