*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-357

FRIENDS OF MCMILLAN PARK, PETITIONER,

v.

DISTRICT OF COLUMBIA MAYOR'S AGENT FOR HISTORIC PRESERVATION, DISTRICT OF COLUMBIA OFFICE OF PLANNING, RESPONDENT,

and

OFFICE OF THE DEPUTY MAYOR FOR PLANNING AND ECONOMIC DEVELOPMENT, INTERVENOR,

and

VISION MCMILLAN PARTNERS, LLC, INTERVENOR.

On Petition for Review of an Order of the District of Columbia
Mayor's Agent for Historic Preservation, District of Columbia Office of Planning
(HPA Nos. 14-393 and 15-133)

(Argued October 17, 2018                                   Decided  May 16, 2019)

*Andrea C. Ferster* for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent.

*Caroline S. Van Zile*, Deputy Solicitor General, with whom *Natalie O. Ludaway*, Chief Deputy Attorney General, and *James C. McKay, Jr.*, Senior Assistant Attorney General, were on the brief, for intervenor Office of the Deputy Mayor for Planning and Economic Development.

*Mary Carolyn Brown*, with whom *Philip T. Evans* and *Michael W. Cabrera* were on the brief, for intervenor Vision McMillan Partners.

*Cornish Hitchcock* was on the brief for *amici curiae*, Committee of 100 on the Federal City and D.C. Preservation League, in support of petitioner.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and FISHER, *Associate Judges*.

GLICKMAN, *Associate Judge*: This case involves the proposed development of a portion of the McMillan Reservoir and Filtration Complex located at 2501 First Street, N.W., in Ward 5 of the District of Columbia. We have seen the case once before, in *Friends of McMillan Park v. District of Columbia Zoning Commission* ("*FOMP I*").[1] There, we remanded decisions of the Mayor's Agent and the Zoning Commission which had approved aspects of the project. Friends of McMillan Park ("FOMP") now challenges the Mayor's Agent's approval on remand of subdividing the parcel and demolishing some of its historic structures.[2]

---

[1] 149 A.3d 1027 (D.C. 2016).

[2] FOMP challenges the Zoning Commission's approval on remand of the related application for a planned unit development ("PUD") in a separate case

*(continued…)*

FOMP argues that the Mayor's Agent erred in several ways, including failing to recuse himself from the case despite his close organizational relationship with  the Office of the Deputy Mayor for Planning and Economic Development (the "DMPED"), a co-applicant; failing to properly assess the project's consistency with the purposes of the Historic Preservation Act, whether the project is of special merit, and the net historic-preservation losses the project would entail; improperly concluding that no reasonable alternatives could achieve the same benefits with less loss of historic features; and prematurely finding that the applicants possess the ability to complete the project.

For the reasons discussed below, we affirm the Mayor's Agent's Order.

## I.  Factual Background

The 25-acre parcel of land at issue in this appeal occupies roughly one fourth of the McMillan Reservoir and Filtration Complex landmark recognized in the D.C. Inventory of Historic Sites.  The parcel, known as the Filtration Complex, houses a water filtration system built at the turn of the twentieth century.  The

_____

*(…continued)*
before this court. *Friends of McMillan Park v. District of Columbia Zoning Commission*, Nos. 18-AA-698 and 18-AA-706.

system has been defunct for over 30 years. It consists of a series of identical underground sand filtration cells and various above-ground components including regulator houses, sand washers, and sand bins.[3] The Filtration Complex is distinct from the adjacent components of the landmark such as the New City Reservoir and McMillan Park, which once included a fountain, walking paths, and recreational areas, but is now closed to the public.

The Filtration Complex has always been industrial in nature and inaccessible to the public, except for a landscaped walk around its perimeter that the federal government closed in World War II and has never reopened. Since then, apart from a few tours conducted in recent years, the entire Filtration Complex has been closed to the public.

In 1986, the federal government decommissioned the Filtration Complex after building a modernized filtration system in the adjacent area where McMillan Park once was. The following year, the District government purchased the Filtration Complex from the federal government for $9.3 million with the understanding that the District would develop it. The District determined that the

---

[3] D.C. Inventory of Historic Sites (Sep. 30, 2009) at 96.

majority of the Filtration Complex "cannot viably accommodate a District agency use or other public use without cost prohibitive new construction."[4] It therefore sought a private development partner for the project.

In the early 2000s, after a lengthy search, the District selected Vision McMillan Partners ("VMP") to partner with the DMPED in developing the Filtration Complex site. In 2006, VMP began drafting development proposals. VMP held over 200 community meetings, during which it presented many of the proposals and discussed community priorities. It also repeatedly sought advice from the Historic Preservation Review Board (the "HPRB") on how best to preserve, retain, and enhance the Filtration Complex's historic features. VMP revised its development proposals over a span of eight years, in response to the feedback it received from the community and the HPRB.

In 2014, VMP and the DMPED (the "applicants") applied for approval of the plan at issue in this appeal. They propose a mixed-use development on the site, to include medical office buildings, rental apartments, rowhouses, a grocery store, various retail stores, a public recreation center, park space, and a preserved and

---

[4] McMillan Surplus Property Declaration Resolution of 2014, Resolution 20-704, 62 D.C. Reg. 1089 (Jan. 23, 2015).

exposed sand filtration cell. The plan involves subdivision of the Filtration Complex site and the demolition of all but one and a half of the remaining underground filtration cells on the site.[5]

The local Advisory Neighborhood Commission ("ANC"), ANC 5E, approved the final development plan as responsive to the community's requests. The HPRB opined that the applicants' proposed demolition of historic structures would not be consistent with the purposes of the Historic Preservation Act. The HPRB's staff report acknowledged, however, that the applicants had consistently made "significant improvement[s]" to the plan in response to the HPRB's suggestions. The staff report also noted with approval that the plan would "substantial[ly] rehabilitat[e] and meaningful[ly] incorporat[e]" most of the site's above-ground structures. The Board concluded that the plan would "retain important character-defining features of the site sufficient to convey its historic characteristics."

---

[5] This would leave seven and a half of the original underground cells intact because six intact cells remain outside the bounds of the 25-acre parcel that the DMPED and VMP seek to develop.

## II. Legal Background

Under the D.C. Historic Landmark and Historic District Protection Act of 1978 (the "Historic Preservation Act"), parties seeking to engage in demolition on or subdivision of a landmark designated for historic preservation must obtain the approval of the Mayor or her agent.[6] The Mayor has appointed the Director of the Office of Planning as the Mayor's Agent for Historic Preservation.[7] The Mayor's Agent will not approve a permit for demolition or allow a subdivision to be recorded unless failure to do so "will result in unreasonable economic hardship to the owner" or doing so is "necessary in the public interest."[8]

"Necessary in the public interest," the alternative relied upon in this case, is defined as being "consistent with the purposes of [the Historic Preservation Act] as set forth in § 6-1101 (b) or necessary to allow the construction of a project of special merit."[9] The purposes of the Historic Preservation Act with respect to

---

[6]  D.C. Code §§ 6-1102 (8), 6-1104 (a), 6-1106 (a) (2018 Repl.).

[7]  ABOUT THE MAYOR'S AGENT, https://planning.dc.gov/page/about-mayors-agent (last visited May 3, 2019).

[8]  D.C. Code §§ 6-1104 (e), 6-1106 (e).

[9]  *Id.* at § 6-1102 (10).

historic landmarks are to promote their "ret[ention][,] . . . enhance[ment][,] . . . adaptation for current use[,] and . . . restoration."[10] If the Mayor's Agent finds that a proposal is consistent with the purposes of the Historic Preservation Act, then he will approve it. If, on the other hand, the Mayor's Agent finds the project is not consistent with the purposes of the Historic Preservation Act, he must consider whether it is nevertheless of "special merit." A project is deemed to be of special merit when it provides "significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services."[11]

If the Mayor's Agent finds a project is of special merit, he must conduct further analysis before approving it. First, the Mayor's Agent must weigh the special merit of the project against the project's effect on the "historical value of the particular landmark."[12] The historic value of a landmark can include consideration of the landmark's historic significance and its architectural

---

[10] *Id.* at § 6-1101 (2).

[11] *Id.* at § 6-1102 (11).

[12] *Citizens Comm. to Save Historic Rhodes Tavern v. District of Columbia Dep't of Housing & Cmty. Dev.*, 432 A.2d 710, 716 (D.C. 1981) [hereinafter *"Citizens Committee"*].

integrity.[13]    If the Mayor's Agent finds that the special merit of the project outweighs the "net historic-preservation loss[es]" it will cause,[14] he must determine whether the applicants have shown that they considered all reasonable alternatives and that none of the alternatives would achieve the same special merit benefits with less demolition or subdivision.[15]  If the project satisfies all these requirements, it may be cleared for demolition or subdivision only where the "permit for new construction is issued simultaneously under § 6-1107 and the [applicant] demonstrates the ability to complete the project."[16]

In 2014, the applicants filed two separate applications seeking the Mayor's Agent's approval for demolition on and subdivision of the Filtration Complex site. They also applied to the Zoning Commission for approval of the project as a Planned Unit Development ("PUD").  In 2015, the Mayor's Agent issued separate orders approving the proposed demolition and subdivision under the special merit prong of the Historic Preservation Act.[17]  The same year, the Zoning Commission

---

[13]  *Id.*

[14]  *FOMP I*, 149 A.3d at 1041-42.

[15]  *Id.* at 1043; *Citizens Committee*, 432 A.2d at 718.

[16]  D.C. Code §§ 6-1104 (h), 6-1106 (g).

[17]  *FOMP I*, 149 A.3d at 1031.

approved the PUD application.[18]  FOMP petitioned for review of these decisions. In *FOMP I*, we vacated all three decisions.  We remanded, instructing the Zoning Commission to provide more specificity regarding the reasons for its PUD approval and directing the Mayor's Agent to address the following issues.[19]

First, we asked the Mayor's Agent to explain "with sufficient clarity" which specific features of land planning he relied upon in finding that this was a project of special merit and why those features, taken together, supported that finding.[20] In doing so, we said, the Mayor's Agent should not include "[a] broad focus on the overall benefits flowing from [the] project," but rather should confine his inquiry to "determining whether one or more specific attributes of [the] project, considered in isolation or in combination, rise to the level of special merit."[21]  We also instructed the Mayor's Agent to clarify how he viewed the medical offices included in the project as being relevant to whether the project is of special merit.[22] And we held that historic-preservation benefits of the project should not be relied

---

[18]  *Id.*

[19]  *Id.* at 1032, 1035-36, 1038-43.

[20]  *Id.* at 1039.

[21]  *Id.* at 1040.

[22]  *Id.* at 1040-41.

on as contributing to its special merit, but may be considered in assessing whether a project is consistent with the purposes of the Historic Preservation Act due to its net historic-preservation benefits.[23]

Second, we stated that if the Mayor's Agent made a finding of special merit in accordance with the foregoing requirements, he should balance the special merit of the project against the "net historic-preservation loss" that the project would cause.[24] In this regard, we directed the Mayor's Agent to establish exactly what historic structures would be preserved.[25]

Third, we clarified the reasonable alternatives analysis that the Mayor's Agent must perform under the Historic Preservation Act. We agreed with FOMP that an applicant is required to demonstrate that the proposed demolition or subdivision of a historic site is reasonably necessary to obtain the project's special merit benefits, not merely that demolition or subdivision is necessary to construct the particular project proposed.[26] "If a reasonable alternative would achieve the

---

[23] *Id.* at 1041.

[24] *Id.* at 1041-42.

[25] *Id.* at 1042.

[26] *Id.*

same special-merit benefits of a project while avoiding or reducing the need for demolition or subdivision, thereby reducing the adverse impact on historic-preservation interests, then the Mayor's Agent cannot properly conclude that the proposed demolition or subdivision is 'necessary to allow the construction of a project of special merit.'"[27] We added that an applicant's burden of proof does not extend to "demonstrat[ing] that there are no other *feasible* alternatives,"[28] but rather to demonstrating that "all *reasonable* alternatives were considered."[29] And we clarified that factors relevant to determining the feasibility of an alternative include "cost, delay, and technical feasibility."[30]

## III. The Mayor's Agent's Order on Remand

On remand, the Mayor's Agent again considered the applications for demolition of the majority of the underground sand filtration cells and for

---

[27] *Id.* at 1043 (quoting D.C. Code § 6-1102 (10)).

[28] *Id.* at 1042 (emphasis added).

[29] *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Citizens Committee*, 432 A.2d at 718).

[30] *Id.* (internal quotation marks omitted) (quoting *Citizens Committee*, 432 A.2d at 718).

subdivision of the Filtration Complex site.  He approved both applications under the Historic Preservation Act.

In his Order, the Mayor's Agent made the following findings:[31]

1) The historic preservation benefits of the proposed project outweigh the preservation losses attributable to demolition of all but two of the underground sand filtration cells.  Accordingly, such demolition is consistent with the purposes of the Act.  D.C. Code § 6-1106(e).

2) The preservation losses of the proposed subdivision of the Site slightly outweigh the preservation benefits of the project, so the subdivision is not consistent with the purposes of the Act.

3) The applicant[s]'[] project is one of special merit in that it proposes specific, publicly beneficial elements of land planning and extensive social and economic benefits having a high priority for community services.

4) The special merit elements of the project substantially outweigh the preservation losses attributable to demolition and subdivision.

5) The proposed demolition and subdivision are necessary to construct a project of special merit.

6) The applicants have the ability to complete the proposed project.

---

[31] Mayor's Agent's Order at 21-22 (April 3, 2018).

FOMP again petitions for review of the Mayor's Agent's Order.

## IV. Discussion

As we set forth in *FOMP I*, "[o]ur review of a Mayor's Agent's decision is limited and narrow."[32] We review the Mayor's Agent's Order to determine whether he applied the law correctly and in accord with our instructions on remand. We will uphold his findings of fact if they "are supported by substantial evidence in the record considered as a whole" and his conclusions of law if they "flow rationally from these findings [of fact]"[33] and are consistent with our articulations of the law in *FOMP I*. Further, we uphold a Mayor's Agent's interpretation of the statutes and regulations he administers unless the interpretation is "shown to be unreasonable or in contravention of the language or legislative history of the statute."[34]

---

[32] *FOMP I*, 149 A.3d at 1039 (internal quotation marks omitted) (quoting *Embassy Real Estate Holdings, LLC v. District of Columbia Mayor's Agent for Historic Pres.*, 944 A.2d 1036, 1050 (D.C. 2008)).

[33] *Id.* (internal quotation marks omitted) (quoting *Kalorama Heights Ltd. P'ship v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 655 A.2d 865, 868 (D.C. 1995) [hereinafter "*Kalorama Heights*"]).

[34] *Id.* (internal quotation marks omitted) (quoting *Kalorama Heights*, 655 A.2d at 868).

FOMP challenges the Mayor's Agent's Order on several grounds.  First, FOMP argues that the Mayor's Agent erred in failing to recuse himself from the case despite his position as head of a subagency of the DMPED.  Second, FOMP contends that the Mayor's Agent erred in finding that the demolition of the underground filtration cells is consistent with the purposes of the Historic Preservation Act.  Third, FOMP maintains that the Mayor's Agent erred in finding that the project is of special merit.  Fourth, FOMP asserts that the Mayor's Agent improperly evaluated the net preservation effects of the project.  Fifth, FOMP alleges that the Mayor's Agent failed to consider reasonable alternatives that would result in less harm to the site's historic features.  Finally, FOMP argues that the Mayor's Agent erred in prematurely determining that the applicants had demonstrated the ability to complete the project.

## A. Disqualification

The Mayor's Agent has delegated the task of holding hearings and writing orders for applications subject to the Historic Preservation Act to a law professor whom he designated to serve as Hearing Officer.[35]  The Mayor's Agent "remains

---

[35]    ABOUT THE MAYOR'S AGENT, https://planning.dc.gov/page/about-mayors-agent (last visited May 3, 2019); HEARING OFFICER BIOGRAPHY,
*(continued…)*

free to . . . reject" the Hearing Officer's draft orders, but in this case he "[c]onfirmed" the Hearing Officer's Order by signing it. The Order states that the Hearing Officer "does not take direction on the proposed outcome of cases from any official."

Just two days before the hearing on remand after *FOMP I*, FOMP for the first time argued that the Mayor's Agent should recuse himself from the case due to his position as the head of the Office of Planning, which is a sub-agency of the DMPED, a co-applicant for this project. FOMP pointed out that the Mayor's Agent "serves at the pleasure of the Mayor" and under the umbrella of the DMPED, and that the District has strong financial interests at stake due to the anticipated tax revenues from the project. These circumstances, FOMP asserted, compromised the Mayor's Agent's actual and perceived impartiality. The Mayor's Agent declined to recuse himself because the Order was drafted by the neutral Hearing Officer and, contrary to FOMP's assertion, neither the Hearing Officer nor the Mayor's Agent had a "personal financial interest in the outcome" of the case. FOMP now argues that the Mayor's Agent erred in failing to recuse himself.

---

*(…continued)*
https://planning.dc.gov/biography/hearing-officer-biography (last visited May 3, 2019).

There is no support for FOMP's claim that the Mayor's Agent's impartiality was *actually* compromised, and even if we assume that the public's perception of the Mayor's Agent's impartiality was compromised, FOMP waived this claim by failing to timely raise it.[36]  FOMP's claim is waivable because it goes to the appearance of partiality rather than to personal bias or prejudice.[37]  Absent a reason to believe a party was intimidated into silence,[38] a party waives its disqualification claim where it knew of the grounds for a waivable disqualification motion but failed to bring that motion in a timely manner in the proceedings.[39]

---

[36] *See Plummer v. United States*, 43 A.3d 260, 265 (D.C. 2012) ("[E]ven assuming the judge was subject to a disqualification . . . because an objective observer reasonably might have questioned his ability to remain impartial, appellant elected not to question it, and we conclude that he waived his assumed right to recusal and is barred from asserting it now.").

[37] We apply the same principles of disqualification to "administrative officers who act in an adjudicative or quasi-judicial capacity" as we do to judges. *Morrison v. D.C. Bd. of Zoning Adjustment*, 422 A.2d 347, 349 (D.C. 1980). Under Rule 2.11 of the D.C. Code of Judicial Conduct, all potential bases for disqualification other than "personal bias or prejudice" are waivable.

[38] For example, in the criminal context, we sometimes have held that a defendant's silence as to a potentially disqualifying factor does not constitute waiver or forfeiture of a disqualification motion because we recognize that defendants face fear of serious repercussions if they question the judge's integrity before trial or sentencing. *See, e.g.*, *Plummer*, 43 A.3d at 269-70 & n.28.

[39] *Gladden v. D.C. Bd. of Zoning Adjustment*, 659 A.2d 249, 257 (D.C. 1995) (denying petitioners' claim that the Board of Zoning Appeals had acted with

*(continued…)*

The disqualifying circumstance FOMP now alleges—that the Mayor's Agent has a close organizational relationship with the Mayor and the DMPED—was clear to all parties at the outset and no material facts changed during the proceeding. Yet FOMP did not raise its motion until two days before the Mayor's Agent's hearing on remand. By this point, the Mayor's Agent had invested an enormous amount of time and effort in this case, and his recusal (without any

---

*(…continued)*

partiality where the "petitioners had the opportunity to focus on and develop the[] points [regarding partiality] at the hearing and did not do so"); *Turner v. Davis, Wick, Rosengarten Co.*, 131 A.2d 303, 304 (D.C. 1957) ("One who declines an opportunity to object [regarding disqualification] before trial cannot be allowed to hold his objection in reserve to await the outcome of the case."). *See also United States v. Brice*, 748 F.3d 1288, 1289 (D.C. Cir. 2014) ("[The defendant] did not raise the impartiality argument in his initial appeal even though he could have done so. . . . [W]e therefore may not reach the merits of []his impartiality claim at this time. . . . [M]otions to recuse based on a judge's alleged bias or lack of impartiality must be raised within a reasonable time after the grounds for recusal are known. . . . [Otherwise] the objection is deemed waived and may not be considered on appeal.") (internal quotation marks and citations omitted); *United States v. Barrett*, 111 F.3d 947, 951-52 (D.C. Cir. 1997) ("[The defendant] did not request recusal below and has therefore waived his right to do so here. . . . [The defendant] was aware of the facts underlying his bias claim from the start. Accordingly, his attempt to raise it for the first time on appeal must be rejected as untimely."); *North Am. Airlines, Inc. v. Civil Aeronautics Bd.*, 240 F.2d 867, 874 (D.C. Cir. 1956) ("[R]espondents are not entitled to sit back until [a] Board decision is imminent and at their convenience come forward with a claim for disqualification of a Board Member based upon alleged facts within respondents' knowledge long prior to consideration of this case by the Board.") (internal quotation marks and citations omitted); *Laughlin v. United States*, 151 F.2d 281, 284 (D.C. Cir. 1945) (finding waiver of a disqualification claim where "the alleged bias on which disqualification was sought had been known to appellant for years" but he failed to raise it in a timely manner at trial).

showing of actual bias on his part) would have resulted in inordinate delay. Because there is no indication that FOMP's failure to seek recusal earlier was caused by intimidation, FOMP's eventual motion was untimely and its disqualification claim is waived.

## B. Consistency with the Purposes of the Historic Preservation Act

### i. Clarification in *FOMP I*

In *FOMP I*, this court clarified that net historic-preservation benefits are relevant to the assessment of whether an application for demolition or subdivision is consistent with the purposes of the Historic Preservation Act.[40]  Thus, "if a project on balance benefits historical-preservation interests more than it harms those interests, the Mayor's Agent need not make a special-merit finding before approving demolition or subdivision."[41]

Based on this clarification of the law in *FOMP I*, the applicants amended their filings on remand to include the argument that the historic-preservation

---

[40]  *FOMP I*, 149 A.3d at 1041.

[41]  *Id.*

benefits of the project outweighed the historic-preservation losses and that the proposed demolition and subdivision were therefore consistent with the purposes of the Historic Preservation Act.

FOMP argues that demolition of a contributing aspect of a historic landmark can never be consistent with the purposes of the Historic Preservation Act, but this argument is inconsistent with *FOMP I* and with the language of the statute itself. By using the phrase "necessary in the public interest"—which is defined as "consistent with the purposes of [the] subchapter as set forth in § 6-1101(b) *or* necessary to allow the construction of a project of special merit"[42]—in the sections on applications for subdivision and demolition, the statute contemplates that a project involving demolition or subdivision may be found to be consistent with the purposes of the Historic Preservation Act if it provides sufficient historic-preservation benefits.[43]   If the legislature intended to prevent approval of demolitions and subdivisions on the basis of consistency, it could have narrowed the scope of approvable demolitions and subdivisions to only those that supported a project of "special merit."

---

[42]  D.C. Code § 6-1102 (10) (emphasis added).

[43]  *Id.* at §§ 6-1104 (e), 6-1106 (e).

## ii. The Mayor's Agent's findings

The Mayor's Agent organized his review of the project's consistency with the Historic Preservation Act into two categories of historic-preservation impact (benefits and losses)—the loss, preservation, or rehabilitation of the site's structures, and the changes to the open-space character of the site. He analyzed the former impact in discussing the application for demolition, while he analyzed the latter impact in discussing the application for subdivision.

The Mayor's Agent first assessed the net historic-preservation loss associated with the site's structures, including the underground filtration cells and the above-ground structures. As discussed earlier, the project calls for the demolition of all but one and a half of the underground sand filtration cells on the site. The Mayor's Agent weighed this loss against the following facts: the public currently has no access to the underground filtration cells; the cells are "dangerously unstable" with "many [of them] in danger of imminent collapse"; the public cannot safely enter the cells without renovations that would undermine their historic integrity; and there is "no reasonable scheme" for re-use of the cells. He also considered that the project would preserve and make available for public viewing, along with tours and explanatory signs, one and a half of the cells. He

further found that the project would "retain[] and restore[] or rehabilitate[] virtually all the above ground structures," including reconstructing Olmsted Walk.

The Mayor's Agent concluded that the proposed demolition was consistent with the purposes of the Act because, despite the historic-preservation losses the demolition would cause, the overall historic-preservation benefits for the site's structures were "extensive and impressive." He found that "the Plan plainly retains, enhances, and restores the most significant elements of the landmark and adapts them for current use." The gain from the rehabilitation of the above-ground structures and the retained underground cells, the Mayor's Agent found, outweighed the loss from demolition of some of the underground cells. Thus, he found the project would create a net historic-preservation gain with respect to the site's historic structures.[44]

---

[44] FOMP argues that the Mayor's Agent erred in failing to consider the HPRB's opinion that demolition of the underground sand filtration cells was inconsistent with the purposes of the Historic Preservation Act, and in failing to explain why he reached the opposite conclusion. FOMP's argument is without merit because the HPRB gave its recommendations prior to the court's clarification in *FOMP I* that net historic-preservation benefits should be considered in the consistency analysis. The HPRB did not make a net historic-preservation determination because it did not consider any anticipated historic-preservation gains prior to concluding that demolition would be inconsistent with the purposes of the Historic Preservation Act. It was therefore reasonable for the Mayor's Agent to look to the HPRB's statements regarding the preservation benefits of the proposed project to aid his new consistency analysis, as he did when he stated that

*(continued…)*

The Mayor's Agent next considered the net historic-preservation loss associated with the site's open-space character and its vistas. He acknowledged that subdivision would allow for the construction of buildings that would "decisively transform the appearance of the Site," alter "[m]uch of its open space character," and reduce its "[c]haracteristic ground-level views." He took into account, however, that the applicants had made "a thoughtful effort to convey the historic significance of the Site to contemporary observers" in the way it proposed to use the above-ground space, including "preserv[ing] the tripartite division of the Site by the service courts."

Ultimately, the Mayor's Agent concluded that subdivision of the site was not consistent with the purposes of the Historic Preservation Act, because it would "facilitate[] the loss of [the site's] significant open space character." He clarified, however, that the net preservation loss from subdivision was slight, because the proposed subdivisions would "retain[] important elements of the organization of

_____

*(…continued)*
the HPRB had praised the latest conceptual design proposal from the applicants as "retain[ing] significant character-defining features of the landmark sufficient to convey its historic character." In this way, the Mayor's Agent considered and addressed the HPRB's recommendation, as he was required to do. D.C. Code § 6-1104 (b).

the space" and foster beneficial adaptation of the site for current use, both of which are key purposes of the Historic Preservation Act.

### iii.    Scope of the consistency analysis

FOMP argues that the Mayor's Agent erred in finding demolition to be consistent with the purposes of the Historic Preservation Act based on the facts that the public currently lacks access to the cells and that the structural reinforcements necessary to allow the public to enter the cells would undermine the cells' historic integrity.  Public accessibility, public safety concerns, and the re-usability of historic features, FOMP contends, are all improper considerations for analysis of consistency with the purposes of the Historic Preservation Act.  FOMP cites to statements in this court's decisions in *District of Columbia Preservation League v. District of Columbia Department of Consumer & Regulatory Affairs* ("*D.C. Preservation League*")[45] and *FOMP I*[46] for support.

---

[45]    646 A.2d 984, 990 (D.C. 1994) ("There is nothing in the [Historic] Preservation Act that allows the Mayor's [A]gent to engage in a balancing of interests which takes into account such factors as the cost of refurbishing [a] dilapidated structure and the threat [the structure] poses to the safety and welfare of the community.").

[46]    149 A.3d at 1042 ("Factors including but not limited to cost, delay, and technical feasibility become proper considerations for determining necessity.")

*(continued…)*

On the contrary, the level of deterioration that a historic structure has experienced and the feasibility of restoring the structure while preserving its historic integrity bear on how available for historic preservation purposes a structure is and thus on how weighty the loss of that structure would be on the net preservation effects of a project. The degree to which the public can safely access and appreciate a historic structure without any intervention is also relevant to calculating the value of preserving that structure. Here, without the project, the underground sand filtration cells will continue to deteriorate and remain unseen and of scant benefit to anyone. In contrast, the Mayor's Agent noted, the project's restoration and opening for public viewing of one and a half cells and provision of "interpretative materials" will allow members of the public to get "an accurate picture of what each [cell] looked like" and a "realistic sense of how sand filtration worked."

Our precedent does not prohibit these factors from being considered under the consistency analysis. The statement that FOMP cites from *FOMP I* about "cost, delay, and technical feasibility" merely approved of those factors as proper

_____

*(…continued)*
(internal brackets and quotation marks omitted) (quoting *Citizens Committee*, 432 A.2d at 718).

considerations for special merit necessity analysis; it did not prohibit their consideration under the separate and distinct analysis of whether a proposal is consistent with the purposes of the Historic Preservation Act.[47] *D.C. Preservation League* is also distinguishable. There, the applicant requested permission to tear down the entirety of a building that had been designated a historic landmark and did not propose any measures to preserve, restore, or adapt elements of the landmark.[48] The Mayor's Agent authorized the demolition despite "fail[ing] to cite any of the enumerated grounds on which the Mayor or her agent may permit the demolition of a historic landmark"—unreasonable economic hardship, consistency with the purposes of the Historic Preservation Act, or special merit.[49] Instead, he authorized demolition by balancing the interest in keeping the historic building against "the cost of refurbishing the dilapidated structure and the threat it poses to the safety and welfare of the community."[50] We held that because the Historic Preservation Act is "exclusively concerned with the retention, restoration, and adaptation of historic buildings," "the relative cost of refurbishing an existing

---

[47] *Id.*

[48] 646 A.2d at 985-87.

[49] *Id.* at 990.

[50] *Id.*

structure, as opposed to destroying it and building a new structure, is an extraneous factor which the Mayor's [A]gent may not consider" when making a determination of consistency with the purposes of the Historic Preservation Act. [51] Further, we stated that elimination of public safety hazards is properly addressed through the Unsafe Structures Act rather than the consistency analysis under the Historic Preservation Act.[52]

In contrast, the justification for the proposed demolition in the present case is not to eliminate a public safety hazard, nor is it based on balancing the historic-preservation interest in retaining the filtration cells against the cost of restoring them. Rather, the Mayor's Agent found that the proposed demolition is consistent with the purposes of the Historic Preservation Act because the project would enable the preservation and opening for public viewing of one and a half cells that will otherwise deteriorate out of the public eye. Where a historic landmark contains many identical features, none of which the public can safely view absent restoration and all of which will significantly deteriorate without restoration, the Mayor's Agent may consider the feasible restoration of some of those features as a

---

[51] *Id.* at 990-91.

[52] *Id.* at 991.

mitigating factor against the preservation losses that stem from the sacrifice of other, identical features.

FOMP also contends that the Mayor's Agent illogically weighed the harms of demolition against the benefits of the project as a whole for purposes of determining consistency with the Act. Citing *FOMP I*, FOMP maintains that the Mayor's Agent should have considered the applications in a more "comprehensive manner,"[53] weighing the entirety of the historic-preservation harms for both demolition and subdivision against the entirety of the historic-preservation benefits of the project.

We disagree with FOMP's characterization of the Mayor's Agent's consistency analysis. In his first review, the Mayor's Agent addressed the separate applications for demolition and subdivision in separate orders. *FOMP I*, in response to FOMP's "concerns about the Mayor's Agent's consideration of [the] demolition and subdivision applications in separate proceedings," presumed "that the Mayor's Agent w[ould] address the demolition and subdivision applications

---

[53] *FOMP I*, 149 A.3d at 1041 n.6.

together and in a comprehensive manner on remand."[54]  On remand, the Mayor's Agent did so by addressing the applications in one order.

It is not accurate to say that, in doing so, the Mayor's Agent weighed the harms of one element of the project against the benefits of the project as a whole. Rather, he analyzed the historic-preservation benefits and losses associated with the site's structures separately from the historic-preservation benefits and losses associated with the site's open space character.  This analysis was within his discretion, as the demolition application implicates the site's structures whereas the subdivision application implicates the site's open-space character.

Upholding the Mayor's Agent's determination that the demolition application is consistent with the purposes of the Historic Preservation Act because the project creates net preservation benefits for the site's structures, we now turn to his determination that the subdivision application is justified because the project is of special merit.

---

[54]  *Id.*

## C. Special Merit

Because the Mayor's Agent found that subdivision of the site was inconsistent with the purposes of the Act, he considered whether the project was of special merit such that it could be approved despite its inconsistency. He concluded that it was. He found that the project would provide significant benefits to the District and the community due to its use of "specific elements of land use planning" and its "provision of high priority community and District benefits."[55] The Mayor's Agent cited six specific benefit categories that contribute to the project's special merit—recreation and open space, affordable housing, mixed-use development, site plan and design elements, economic benefits to the District, and the community benefits package.[56] We discuss the Mayor's Agent's findings as to each of these categories and FOMP's challenges to them below.

---

[55] *See* D.C. Code § 6-1102 (11).

[56] We disagree with FOMP's contention that the Mayor's Agent erred in finding that the project "as a whole" is of special merit in contravention of *FOMP I*'s instruction to focus on specific meritorious features. *See FOMP I*, 149 A.3d at 1039-40. That argument mischaracterizes the Mayor's Agent's statements and ignores his specific findings. Further, in *FOMP I* we held that a finding of special merit may "rest in whole or in part on a combination of features that in isolation would not necessarily rise to the level of special merit." *Id.* at 1039.

FOMP does not dispute the Mayor's Agent's finding that the project's proposed development of recreational and open spaces for public use contributes to its special merit. The Mayor's Agent praised the project's "6.2 acres of green space," calling it a "substantial amenity." He noted that the District's Comprehensive Plan emphasizes the "dire need" for parks providing "both active and passive recreational uses" in the area in which the Filtration Complex site is located. He emphasized that because the Filtration Complex has always been an "inaccessible industrial landscape," the proposed park would be the first park within the Filtration Complex site.[57] The Mayor's Agent also highlighted the large community center, pool, and historic tours the project would provide.

As for affordable housing, the Mayor's Agent found the project would dedicate "20 percent of the total residential units . . . to persons earning between 50

---

[57] This finding sufficiently responds to our concern in *FOMP I* that including the park in the special merit calculus was impermissible because the park was a historic-preservation benefit. *See FOMP I*, 149 A.3d at 1041. In other words, the creation of a park counts as preservation of a historic feature only to the extent that it preserves a degree of open space on the property. It goes far beyond preservation, however, by affirmatively providing publicly accessible park amenities never before present on the Sand Filtration Complex. It is permissible to view the benefits that go beyond the preservation of open space as factors contributing to special merit. Such analysis avoids the "double-counting" of amenities (as both contributing to special merit and decreasing the historic-preservation losses) that we warned against in *FOMP I*.

and 80 percent of area median income [("AMI")], with 85 of these units set aside for persons earning between 50 and 60 percent of AMI" and "nine rowhouses [set aside for] . . . families earning no more than 50 percent of AMI." He deemed these housing provisions to contribute to special merit both as a specific feature of land planning and as a benefit having high priority for community services. FOMP argued below and continues to argue on appeal that the project's affordable housing provisions are insufficient to contribute to special merit because the project would fail to meet the City's "most pressing affordable housing needs" and would intensify gentrification.[58]

---

[58] FOMP also asserts that the proposed project would provide the "lowest percentages of affordable housing of any prior public-private development project." This may be so, but the project can provide a meritorious amount of affordable housing even if other projects have provided more.

FOMP notes that the affordable housing provided by the project "would *not* satisfy the amount or level of affordability required by *current* statutes applicable to public-private developments approved after 2014." FOMP does not present an argument based on this assertion, nor does it contest the testimony on the record indicating that the project is exempt from the current affordable housing requirements. Failure to meet the affordable housing standards applicable to other projects does not negate the benefit derived from providing a significant amount of affordable housing, as this project would.

Finally, FOMP contends that the project would violate the District's responsibilities under the Fair Housing Act ("FHA") by failing to provide affordable housing at income levels that the majority of African-American residents of the District could afford. We reject this argument because FOMP cites to no FHA provisions or other legal authority that suggest the project would violate the FHA.

The Mayor's Agent responded that the District's housing needs for very low-income residents "do[] not detract from the social value of providing affordable housing for persons marginally less disadvantaged in an expensive housing market." He declined to analyze FOMP's argument that the project would cause gentrification because consideration of such a consequence would be outside the purview of his review. As we explained in *FOMP I*:[59]

> [T]he Mayor's Agent's task is not to balance all of the benefits of the project against all of the adverse impacts of the project. That broader task is assigned to the Zoning Commission. Rather, the Mayor's Agent's task is to balance the special merit of the project—the specific aspects of the project that provide 'sufficiently special' benefits—against one particular adverse impact—the net historic-preservation loss that the project would entail.

The Mayor's Agent's affordable housing findings are reasonable. The applicants were not required to include any housing in their proposal. Thus, we see no reason why the inclusion of housing, twenty percent of which will go to low-income residents, cannot contribute to special merit.

---

[59]   149 A.3d at 1041-42 (quoting *Committee of 100 on the Federal City v. District of Columbia Department of Consumer and Regulatory Affairs*, 571 A.2d 195, 200 (D.C. 1990) [hereinafter "*Committee of 100*"]).

Turning to the mixed-use nature of the project, the Mayor's Agent found that it contributed to special merit. He acknowledged that mixed-use developments are "not unusual," but found that it is unusual for a project to "deliver[] . . . such a wide mix of complementary uses on a large vacant site." The Mayor's Agent identified the proposed medical office buildings as "an integral part of th[e] mix[ed] [uses]" on the property, because they would ensure a steady stream of daytime customers and visitors for the rest of the development. He also noted the site's ideal location for healthcare development because of the "large[,] aging hospital complex just north of it" and the "uncontradicted testimony that no other commercial use would be viable in that location." The Mayor's Agent also noted that the Comprehensive Plan identifies the McMillan property as an expected and desirable location for the District's growth.

FOMP makes three main arguments against the Mayor's Agent's finding that the project's mixed-use nature contributes to its special merit. First, FOMP argues that the Mayor's Agent failed to show that the mixed-use nature of the project qualifies as a "specific feature of land planning" for purposes of contributing to the special merit of the project. FOMP asserts that the Mayor's Agent failed to explain how a mixed-use development has "inherent special merit value . . . independent of [its] perceived role in the overall economic viability of

[the] development proposal." To the contrary, however, the Mayor's Agent explained that the project's mixed-use nature will make accessible a wide range of services for the residents of the housing that the project will create. He also praised the proposed mixed-uses as "contribut[ing] to public safety [and] . . . urban vitality." The mixed-use nature of the project, the Mayor's Agent explained, would make possible the co-existence of housing options, a vibrant business district, and "improve[d], activate[d], and maintain[ed] . . . public spaces." He concluded that this uniquely broad and substantial range of mixed-uses contributed to the project's special merit. We think it was within his discretion to make this policy judgment.

Second, FOMP contends that the Mayor's Agent's finding that healthcare facilities would provide the necessary "economic foundation" for the project cannot enter the special merit calculus. We disagree. "In making [a] special merit determination, the feasibility of the amenities [is] a legitimate consideration."[60] This is so because no matter how meritorious a project may seem in the abstract, it cannot be of special merit if it lacks the economic viability to produce the claimed

---

[60] *Committee of 100*, 571 A.2d at 203.

benefits.[61]   Thus, the Mayor's Agent did not err in noting that an aspect of the project's mixed-use nature—its inclusion of medical office buildings—provided the necessary economic foundation to sustain the project.

Third, FOMP asserts that the Mayor's Agent erred in failing to acknowledge and explain his switch from finding in his first order that "the medical offices themselves d[id] not contribute to the special merit of the project" to finding in his order on remand that they did so contribute.  This argument mischaracterizes the Mayor's Agent's findings.  As in his first order, the Mayor's Agent discussed the healthcare buildings not because he found that they independently contributed to special merit, but because he viewed them as an essential economic anchor to the project's beneficial mixed uses.  He did not reverse his position on the type of contribution the medical offices could make to special merit and he answered *FOMP I*'s call to clarify his findings.

The Mayor's Agent found that the project's site plan and design elements also contributed to its special merit.  He cited the architectural cohesiveness of the building designs that "differentiate the project from generic infill development,"

---

[61] *See id.*

the desirable "internal circulation and connectivity to the surrounding streets," and the "scrupulously environmentally sustainable design," including the overall LEED Gold rating, pervious pavement, rain gardens and bioswales.

FOMP contends that because the site plan and design elements cited by the Mayor's Agent were "required as part of the PUD process or by other government regulations," they "cannot do double-duty" as factors contributing to special merit. FOMP argues that under this court's precedent,[62] features that would already be included in a development project usually cannot contribute to a finding of special merit. We disagree with this contention. Just because a developer's superior amenities also support its application for PUD approval, that is no reason to disregard those amenities in considering whether the project is of special merit.

The Mayor's Agent's found that the economic benefits the project would generate for the District of Columbia contributed to its special merit. He acknowledged that economic benefits must be "exceptionally large" in order to be deemed to make such a contribution. He found that to be true in this case, citing the project's provision of "extensive employment opportunities"—nearly five

---

[62] *See id.* at 200-01; *MB Assocs. v. District of Columbia Dep't of Licenses, Investigation & Inspection*, 456 A.2d 344, 346 (D.C. 1982).

thousand permanent jobs and three thousand construction jobs—and the developer's commitment to give preferred treatment to the applications of District residents for those jobs.

FOMP contends that the Mayor's Agent erred in reversing his earlier position that the employment benefits were too common and speculative to count towards special merit without receiving any updated evidence to indicate otherwise. FOMP adds that the project's anticipated employment benefits do not contribute to special merit because they are, at most, only as large as the benefits commonly expected from a project of this size.

We think FOMP's arguments are flawed for two reasons. First, the Mayor's Agent was free to change his decision and reasoning on remand and he appears to have done so based on *FOMP I*'s indication that economic benefits can contribute to special merit although they cannot constitute special merit alone.[63] Second, although factors common to "*all* projects" "ordinarily" cannot contribute to a

---

[63] *FOMP I*, 149 A.3d at 1039 (citing to *Citizens Committee*, 432 A.2d at 717 n.13, for the proposition that "projected economic benefit" to the District could support a finding of special merit).

finding of special merit,[64] employment benefits of this scope are hardly common to all development projects, even if they may be present in a few projects of similar size. Thus, we are not persuaded that the Mayor's Agent erred in finding that the employment benefits of the project contribute to its special merit.

The sixth category contributing to the Mayor's Agent's finding of special merit is the project's community benefits package, which overlaps with the economic benefits noted above. The Mayor's Agent highlighted the package's commitment to using local businesses and contractors to carry out at least 35 percent of its budgeted work, hiring District residents for at least 51 percent of the jobs the project will create, and devoting over $1 million to a job training program.

FOMP argues that the project's community benefits package cannot contribute to the project's special merit because many of the benefits do no more than is already required by law. For example, FOMP states that the applicants are

---

[64] *Committee of 100*, 571 A.2d at 200 (emphasis added); *see Kalorama Heights*, 655 A.2d at 870 (holding that the Mayor's Agent did not err in finding that a condominium proposal was not of special merit where the applicant had not "shown that its project ha[d] social or other benefits that differ from those of other condominium projects"); *MB Assocs.*, 456 A.2d at 346 (upholding a denial of a special merit finding where the benefits asserted were "common to all downtown redevelopment plans").

statutorily required to contract with small and local businesses and to adopt a "first source" agreement regarding employment of District residents.[65]  FOMP adds that the grant-based benefits, which are not required by law, are common for PUDs and are ineffective.

FOMP is correct in its assertion that the District's law requires developers of "government-assisted" projects to subcontract at least 35 percent of the dollar volume of a construction contract to small businesses[66] and to sign an agreement providing that the "first source for finding employees to fill all jobs created . . . [or] to fill any vacancy occurring in all jobs covered by an employment agreement will be the First Source Register."[67]  Nevertheless, the required nature of these benefits does not necessarily prevent them from being considered to contribute to a project's special merit, especially for projects of this magnitude.  Although these benefits are required for projects involving a public-private partnership, they are not "common to *all* projects."[68]

---

[65]  *See* D.C. Code §§ 2-218.41, 2-219.03 (2018 Supp.); D.C. Code § 2-218.46 (2016 Repl.).

[66]  D.C. Code § 2-218.46 (a).

[67]  *Id.* at § 2-219.03 (a), (b).

[68]  *Committee of 100*, 571 A.2d at 200 (emphasis added).

Although FOMP mentions that past job training programs have not achieved their anticipated goals, it provides insufficient evidence for us to overturn the Mayor's Agent's finding that the $1 million job training program will contribute to the special merit nature of the project (even if it would not alone be sufficient to show special merit). There was sufficient evidence in the record upon which the Mayor's Agent could base his determination. For example, the Mayor's Agent heard testimony that the job training program was tailored to the site and would be "one of the most innovative and ambitious workforce development initiatives in the country." Additionally, the training initiative involves not only a grant of $1 million, but also the construction of an on-site permanent job training center— Washington Center for Health Careers. Thus, the Mayor's Agent's finding that the community benefits package contributed to the project's special merit was based on substantial evidence, and we must uphold it.

After discussing the above six factors contributing to special merit, the Mayor's Agent outlined the manner in which the varied benefits of the project align it with numerous policies in the Comprehensive Plan and thereby set it apart from previous cases.[69] He stated that the project's "fulfillment of so many

---

[69] The Mayor's Agent credited testimony indicating that the project would "directly advance over 100 policies and actions in all 13 citywide elements and the

*(continued…)*

potentially conflicting elements of the Comprehensive Plan support[ed] . . . [his] finding that the Plan for McMillan satisfies the standard for special merit."

FOMP argues that this conclusion contravenes *FOMP I*'s holding that "overall consistency" with the Comprehensive Plan is insufficient to constitute a factor contributing to special merit.[70]  We think FOMP misreads the Mayor's Agent's decision.  The Mayor's Agent's finding of special merit precedes his discussion of aspects of the Comprehensive Plan.  In other words, he does not rely upon the project's general consistency with the Comprehensive Plan as a factor contributing to the project's special merit.  Therefore, his discussion of the Comprehensive Plan did not run afoul of the rule we announced in *FOMP I*.

---

*(…continued)*
mid-city element."  He also highlighted the project's conformity to the Land Use Element for Large Sites, which envisions development on large sites to include mixed uses, sustainable design, enhanced circulation, and community benefits, including "affordable housing, new parks and open spaces, health care and civic facilities, [and] public educational facilities."  LU 1.2.1-1.2.7.

[70]  149 A.3d at 1040.

**D. Whether the Special Merit Outweighs the Net Preservation Loss**

As required by *FOMP I*,[71] the Mayor's Agent weighed the net historic-preservation losses from the project against its special merit. The Mayor's Agent first combined the net preservation loss from both demolition and subdivision that he had found earlier. He concluded that, at most, the net historic-preservation loss would be small. He then compared the small net historic-preservation loss against the special merit of the project. He praised the project as "well-planned [and] visually coherent" and noted that it would "incorporat[e] substantial amounts of affordable housing, [] generat[e] significant economic and social benefits, [and] provide[] greater public benefits than would more extensive retention of redundant and inaccessible underground cells and a visually open but obsolete industrial site." The Mayor's Agent concluded that the special merit benefits of the project "outweigh all preservation losses" it would cause.

FOMP argues that the Mayor's Agent failed to acknowledge the full scope of the historic losses the project would entail, which fatally biased his assessment of whether the project's special merit outweighed the historic value of what will be

---

[71] *Id.* at 1041-42.

destroyed. We think FOMP does not substantiate this claim, however. Further, FOMP significantly underplays the Mayor's Agent's acknowledgement of the scope and seriousness of destruction of historic elements that this project would entail. For example, the Mayor's Agent recognized that demolishing even a portion of a historic landmark is a "grave matter" and that demolishing the majority of the underground sand filtration cells, as proposed, would "destroy[] the capacity to experience the vast scale of the numerous vaulted chambers purifying large quantities of water." Because the Mayor's Agent's statement that the net preservation losses would be small was made in this context, we conclude that FOMP's contention is unfounded. We cannot say that the Mayor's Agent's assessment of the net preservation loss associated with the project was unreasonable. Thus, we hold that he did not err in finding that the special merit of the project outweighed the net historic-preservation loss it would cause.

## E. Reasonable Alternatives and Burden of Proof

The Mayor's Agent found that the applicants had properly considered reasonable alternatives and demonstrated that no reasonable plan could achieve the same special merit benefits with less preservation loss. He added that FOMP had "not suggested an alternative plan with even a glimmer of plausibility."

The Mayor's Agent had ample evidence to support his finding that the applicants had considered all reasonable alternatives and that none of them would achieve the same benefits with less demolition or subdivision. Four of the applicants' witnesses testified to this effect.

Aakash Thakkar, the senior vice president for one of the developers, EYA, testified as follows:

> [W]e can firmly say that we have studied many options and this option best balances preservation, open space, new development and the very real economic considerations that must be taken into account when creating any preservation and development project. . . . [T]his level of demolition and subdivision[] are absolutely necessary to obtain our proposed special merit benefits. Demolition must occur in order to build the affordable housing, retail, community center, parks, and healthcare jobs our plan provides. None of this could be built on top of cells[.] . . . The subdivision is simply needed to enact the development plan and any mixed-use proposal would require such subdivision. . . . [W]e, nor anyone else to our knowledge, can or has developed a plan that would achieve our level of special merit with any less demolition or subdivision.

Matt Bell, principal with the lead designers for the project, Perkins Eastman DC, testified:

> [C]an special merit features be achieved with less demolition? My answer is no. . . . [M]ore open space for cell preservation provides less development to activate those spaces, less affordable housing, less healthcare uses, less retail for the community, [and] less job training and job creation.

Adam Weers, principal with the developer of the healthcare component of the project, Trammel Crow Company, stated that:

> This project's ability to provide such a substantial and comprehensive package of benefits [to the community] is directly tied to the level of development included in [the] plan.

Finally, Shane Dettman, an expert in land planning and zoning, testified that:

> There's no economically viable mixed use development involving less demolition and less or no subdivision that would meet the goals of the [C]omprehensive [P]lan to the extent that would support a conclusion of special merit. . . . And . . . there are no reasonable alternatives that would avoid or reduce the need for demolition or subdivision and achieve the same special merit benefits[.]

FOMP argues that one of its experts, Tom Moriarty, "proffered a different, highly-plausible development scenario" that the Mayor's Agent "wholly disregarded." Mr. Moriarty's testimony, however, did not present a concrete

alternative development plan. Rather, after admitting that he did not contest the necessity of some demolition and subdivision on the site, he recommended that the District reevaluate the plan because it was "potentially possible" for the District to gain more financial benefit from the project with less destruction of open space by changing the density and type of housing constructed. Further, Mr. Moriarty's discussion of the potential historic-preservation benefits of his idea as opposed to the current proposal was cursory at best. His suggestions are akin to the alternatives that we determined would be unreasonable in *Don't Tear It Down, Inc. v. District of Columbia Department of Housing & Community Development* due to their introduction "at the ninety-ninth hour" and their lack of "regard for time frames, cost, [and] efficiency."[72]

FOMP also argues that, by stating that "[t]he opponents have not suggested an alternative plan with even a glimmer of plausibility," the Mayor's Agent improperly shifted the burden of proof—requiring that FOMP show that reasonable alternatives existed rather than requiring the applicants to show that they did not. FOMP contends that this shift, in combination with the Mayor's

---

[72] 428 A.2d 369, 379 (D.C. 1981).

Agent's failure to address Mr. Moriarty's development scenario, led to an incorrect conclusion on the project's necessity.

We disagree with the argument that the Mayor's Agent shifted the burden of proof and failed to require that the applicants make the requisite showing. To the contrary, as described above, the applicants' witnesses at the hearing provided ample indication that they had considered numerous alternatives and that no other design could provide the same level of benefits with less demolition or subdivision. The Mayor's Agent noted FOMP's lack of concrete alternatives only after finding that the applicants "ha[d] satisfied [the] standard" of proof for necessity and had engaged in an extensive process of revisions over several years in response to historic-preservation concerns raised by the HPRB and the local ANC, that efforts to achieve any further historic-preservation gains "would materially detract from one or more special merit elements or decrease the affirmative preservation program," that "[t]he record . . . amply supports the necessity of the [proposed] extent of demolition and subdivision," and that "[r]equiring the applicants to consider more or different alternatives after the long road they have travelled would be only an exercise in obstruction." Thus, in context, the Mayor's Agent's reference to FOMP's lack of alternatives does not indicate a shift in the burden of proof.

For the reasons above, we uphold the Mayor's Agent's finding that the applicants demonstrated that there are no reasonable alternatives capable of achieving the same special merit benefits with less demolition or subdivision. We conclude that substantial evidence supported his determination and he drew rational conclusions from that evidence. The absence of concrete alternative proposals from FOMP further underscores the reasonableness and necessity of the applicants' plan.

## F. Ability to Complete the Project

Where the Mayor's Agent approves demolition or subdivision on the basis of a project's special merit, a permit for that demolition cannot be issued and that subdivision cannot be recorded until a permit for new construction "issue[s] simultaneously under § 6-1107"[73] and "the owner demonstrates the ability to complete the project."[74] As the Mayor's Agent discussed in his Order, the latter determination "normally should be made at the time of the issuance of the

---

[73] D.C. Code §§ 6-1104 (h), 6-1106 (g). The Mayor's Agent's Order indicates that "there is no substantive question about the issuance of a permit for new construction" because "the HPRB approved the plan for new construction more than four years ago." FOMP does not dispute this finding, nor does it make an argument about this requirement.

[74] *Id.*

demolition permit, in which case the primary agency [making the determination] would be the Department of Consumer and Regulatory Affairs [("DCRA")]."[75]

At the hearings below, FOMP argued that the applicants had failed to prove that they could secure a tenant for the healthcare facility. FOMP therefore requested that the Mayor's Agent "condition any order permitting demolition on the applicants making several specific showings, including obtaining an anchor tenant and all applicable licenses for the health care facility."[76] The Mayor's Agent declined to do so, finding that the "applicants have the ability to complete the proposed project," because they had provided sufficient evidence to show that they would be able to obtain a healthcare tenant and the necessary healthcare permits.

FOMP now argues that there was insufficient evidence in the record for the Mayor's Agent to conclude that the applicants were able to complete the project.

---

[75] *See* 12-A DCMR § 105A.1 (1) (2017) (requiring parties intending to "construct . . . alter . . . [or] demolish . . . a building or other structure" to apply to the Department of Consumer and Regulatory Affairs to "obtain the required permit(s)" before beginning work); 12-A DCMR § 103A.1 (2014).

[76] *See* 10-C DCMR § 411.4 (2002) ("When approving a project of special merit, the Mayor's Agent may specify any documents or assurances the applicant must submit in order to demonstrate the ability to complete the project, as required for permit issuance.").

The applicants respond that the Mayor's Agent appropriately determined that they had demonstrated the ability to complete the project. In the alternative, the applicants asserted at oral argument that even if the Mayor's Agent's determination was premature, they are not required to demonstrate their ability to complete the project prior to obtaining a demolition permit because applications approved as consistent with the purposes of the Historic Preservation Act are not subject to that requirement.

Substantial evidence in the record supports the Mayor's Agent's determination that the applicants had provided sufficient proof of their ability to find a healthcare tenant for the project and obtain the permits associated with the proposed healthcare uses.[77] We therefore affirm that finding.

---

[77] The Mayor's Agent heard testimony from Adam Weers, the principal of the applicants' development partner for the healthcare component of the project, Trammel Crow Company. Mr. Weers testified that the healthcare portion of the project would "directly address[] community . . . priorities," that the project was "perfectly position[ed]" near the aging Washington Hospital Center Campus, which "often struggle[s] with demand levels that cause them to operate beyond 100 percent capacity of their existing buildings," that Trammel Crow Company is "the largest commercial developer . . . [and] healthcare developer in the country . . . [with] a strong track record of completing similarly large and complex healthcare developments across the country," and that there was a "very high probability" that the potential healthcare tenants in talks with the applicants at the time would become the actual tenants.

*(continued…)*

The Mayor's Agent's limited determination, however, is not equivalent to a determination that the applicants possess the ability to complete the entirety of the project sufficient to warrant issuance of a demolition permit or recording of a subdivision *at this time*. To the extent the Mayor's Agent indicated that the applicants need not make any showing of their ability to complete the project before the DCRA, that is incorrect. The Mayor's Agent's Order addressed the applicants' readiness solely with regard to the healthcare building component of the project. The applicants must still demonstrate ability to complete the entirety of the project at the time they apply for a demolition permit from the DCRA.

Further, the Mayor's Agent's findings regarding the demolition application's consistency with the purposes of the Historic Preservation Act necessarily require the applicants to demonstrate their ability to complete the project before obtaining a demolition permit. The premise of the Mayor's Agent's finding of consistency

---

*(…continued)*

The Mayor's Agent credited this testimony. He found that Trammel Crow indisputably has "the financial capacity . . . to complete the health care facility" and that the applicants had "plainly established" "[t]he likelihood of success" for their proposed healthcare facility.

We are unpersuaded by FOMP's argument that this credited evidence was insufficient to support the Mayor's Agent's finding that the applicants possessed the ability to complete the healthcare component of the project.

was that the historic-preservation benefits of the *completed* project would outweigh the historic-preservation losses the proposed demolition would entail. Thus, as long as legal obstacles to the completion of the entire project remain, demolition of historic structures on the Filtration Complex will not be consistent with the purposes of the Historic Preservation Act. One remaining legal obstacle is the on-going appeal of the Zoning Commission's approval of the PUD application for the project. Until that appeal and any other obstacles to the applicants' ability to complete the project are resolved, the applicants may not commence demolition.

## V. Conclusion

For the foregoing reasons, we affirm the Order of the Mayor's Agent. The applicants are not at liberty to begin demolition or subdivision, however, unless the appeal of their PUD approval is favorably resolved and the Department of Consumer and Regulatory Affairs independently determines that they possess the ability to complete the project.